CENTEQ REALTY, INC., Petitioner,

v.

Karelyn SIEGLER, Respondent.

No. 94–0573.

Supreme Court of Texas.

Argued Jan. 19, 1995.

Decided May 25, 1995.

Paul J. Dobrowski, Grant J. Harvey, Houston, for petitioner.

John M. O'Quinn, Jacqueline Lucci, Mark T. Croley, Andrew S. Pikoff, for respondent.

CORNYN, Justice, delivered the opinion of the Court, joined by PHILLIPS, Chief Justice, GONZALEZ, HIGHTOWER, HECHT, ENOCH, SPECTOR, and OWEN, Justices.

In this premises liability case, we consider whether Centeq Realty, Inc., (Centeq) owed Karelyn Siegler a duty of reasonable care to protect her from the criminal acts of a third party. The trial court granted Centeq's motion for summary judgment. The court of appeals reversed. 874 S.W.2d 304. Because we determine that Centeq owed no legal duty to Siegler, we reverse the judgment of the court of appeals and render judgment that Siegler take nothing from Centeq.

Through a number of foreclosures, United Savings (United) came to own a majority of the units at the Warwick Towers, a high-rise condominium complex in Houston. United contracted with Centeq to market all of its units and assigned Centeq all voting rights associated with those units. Although Centeq was not itself an owner, the assignment of United's voting rights gave Centeq the right to vote on all major decisions affecting unit owners at the Warwick Towers, including the right to nominate and vote for the board members of the Warwick Council of Co–Owners (Warwick Council), the homeowners' association charged with maintaining the areas owned in common by the unit owners. Furthermore, by virtue of an agreement executed between United and the Warwick Council, United was entitled to have a representative on the board of the Warwick Council, a position that United filled with Carla Van Over, the president of Centeq and a resident of the Warwick Towers.

On January 25, 1990, Siegler, a Warwick Towers resident, was attacked and kidnapped from the parking garage of the Warwick Towers. She later filed suit against the Warwick Council and Centeq, alleging that they were negligent in failing to provide adequate security on the premises. According to Siegler's first amended petition, Centeq owed her a legal duty to provide adequate security because (1) Centeq "owned, controlled, and/or managed" the premises on which Siegler was injured, and because (2) Centeq was "an agent and/or representative of Warwick Towers and/or Warwick Counsel [sic] relative to the daily operation of the [Warwick Towers] premises." Centeq filed a motion for summary judgment, supported by the affidavit of Carla Van Over, who attested that (1) Centeq was not an agent or representative of Warwick Towers; (2) Centeq was not the agent of the Warwick Council, nor did it have a contractual relationship with the Warwick Council; (3) as a voting member of the Warwick Council, Van Over's obligations ran to the unit owners, not to Centeq; and (4) Centeq did not own, control, or manage the premises of the Warwick Tow-

ers. In response, Siegler filed the affidavit of Donna Green, the General Manager of the Warwick Council, who asserted, in pertinent part, that (1) Centeq was the agent of United, (2) Centeq controlled, by proxy, the majority of unit owner votes, which gave Centeq the power to select the board of the Warwick Council, change the bylaws of the Warwick Council, and to approve or deny all large expenditures; (3) because Centeq controlled the majority of votes, Centeq was able to select a majority of the board of the Warwick Council that voted in the best interest of Centeq; and (4) Centeq held itself out as the agent of the Warwick Towers, as evidenced by advertisements, phone listings, and the fact that Centeq maintained a sales and leasing office on the Warwick Towers premises. The trial court granted Centeq's motion for summary judgment and severed Siegler's claims against Centeq.[1] A divided court of appeals reversed, holding that Siegler had raised a fact issue as to whether Centeq controlled the security at the Warwick Towers.

To obtain summary judgment, a movant must either negate at least one element of the plaintiff's theory of recovery, *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936 (Tex.1972), or plead and conclusively establish each element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). Once the defendant produces sufficient evidence to establish the right to summary judgment, the plaintiff must present evidence sufficient to raise a fact issue. *"Moore" Burger,* 492 S.W.2d at 936–37. Evidence favorable to the non-movant must be accepted as true and every reasonable inference indulged in the non-movant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex. 1985).

The threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d

523, 525 (Tex.1990). The plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant to establish liability in tort. *Greater Houston Transp. Co.,* 801 S.W.2d at 525. The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.*

Generally, a person has no legal duty to protect another from the criminal acts of a third person. *Greater Houston Transp. Co.,* 801 S.W.2d at 525; *see also* RESTATEMENT (SECOND) OF TORTS § 315 (1965) (noting that no general duty exists to control the conduct of others). There are, however, exceptions to this general rule. In the landlord-tenant relationship, for example, a landlord who retains control over the security and safety of the premises owes a duty to a tenant's employee to use ordinary care to protect the employee against an unreasonable and foreseeable risk of harm from the criminal acts of third parties. *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993); *cf. Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985) (holding that apartment management had a duty to protect against foreseeable criminal activity); *Haight v. Savoy Apartments,* 814 S.W.2d 849, 853–54 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (holding that apartment management had a duty to protect a tenant's guest). The right to control the premises is thus one of the factors that determines whether a legal duty should be imposed on the owner or possessor of the premises.

Siegler contends that there is a fact issue as to whether Centeq controlled the security of the parking garage at the Warwick Towers. Siegler's argument relies upon two premises: first, that the Warwick Council owed Siegler a duty to provide adequate security because it controlled the maintenance and security of the common areas, and, second, that Centeq, by holding a majority of the unit holder votes, controlled the actions of the Warwick Council, thus allowing it to control security at the Warwick Towers.

1. Siegler also sued Warwick Towers, Inc., No. 2, and Smith Protective Services, Inc., asserting that they had also breached a duty to provide adequate security, but those claims are not before us.

We have never decided whether the exception to nonliability articulated in *Exxon* applies with equal force to the relationship between a condominium homeowners' association and its unit holders. In *Dutcher v. Owens,* 647 S.W.2d 948, 950 (Tex.1983), we implied but did not squarely hold that a homeowners' association owes a duty to its residents to use reasonable care in maintaining the safety of common areas. The sole issue before us in *Dutcher* was the *allocation* of liability, not the *existence* of liability. *Id.* at 948. We note, though, that courts in other jurisdictions have imposed upon a homeowners' association the duty to exercise due care for the residents' safety in those areas under its control. *See Frances T. v. Village Green Owners Ass'n.,* 42 Cal.3d 490, 229 Cal.Rptr. 456, 459–60, 723 P.2d 573, 576–77 (1986) (comparing the role of a homeowners' association to a landlord and holding that a homeowners' association owes a duty to provide reasonable security in common areas); *see also Newell v. Best Sec. Syst., Inc.,* 560 So.2d 395, 397 (Fl.Dist.Ct.App.1990). *But see, Moody v. Cawdrey & Assoc., Inc.,* 68 Haw. 527, 721 P.2d 707 (1986), *rev'g* 6 Haw. App. 355, 721 P.2d 708 (1986). *See generally,* Eric Hollowell, Annotation, *Condominium Association's Liability to Unit Owner for Injuries Caused by Third Person's Criminal Conduct,* 59 A.L.R. 4th 489 (1988).

In this case, Siegler presented evidence that the Warwick Council controlled the security of the common areas, including the parking garage. Assuming without deciding that the Warwick Council owed a duty to its residents to provide adequate security in the parking garage, we turn to the second component of Siegler's cause of action against Centeq: whether Centeq's power to cast United's votes gave it the power to control the board of the Warwick Council and thereby control security at the Warwick Towers.

We have previously noted the similarities between homeowners' associations and corporations, leading us to conclude that a homeowners' association is a separate legal entity from its unit owners, just as a corporation is distinct from its shareholders. *Dutcher,* 647 S.W.2d at 950 (citing *White v. Cox,* 17 Cal.App.3d 824, 95 Cal.Rptr. 259 (1971)). In the corporate context, we will disregard the corporate fiction under the "alter ego" theory when the corporation is "organized and operated as a mere tool or business conduit of another corporation." *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986). Applying the alter ego theory by analogy to the case at hand, Siegler's legal argument, in effect, asks us to disregard the separate legal existence of the Warwick Council and to view it as a mere conduit through which Centeq exercised power over all security decisions. Based on this record, we decline to do so.

Siegler submitted uncontested summary judgment proof that the proxy agreement between United and Centeq authorized Centeq to vote a majority of the total homeowners' association votes in elections for the board of the Warwick Council. Siegler did not, however, present any proof that the board members would not have been elected but for Centeq's exercise of its proxy votes, nor did Siegler allege any facts tending to show that Centeq actually directed the board members' votes on security issues.[2] To the contrary, Carla Van Over attested that "[a]s a voting member of Warwick Counsel [sic] my obligations ran to the homeowners—not to Centeq."

We conclude that Centeq's power to elect a majority of the board of the Warwick Council

---

2. Siegler suggests that Centeq was able to nominate and elect board members that were beholden to Centeq. Green, the general manager of the Warwick Council, testified by affidavit that:
> Centeq was able to select a majority of the Board that voted in the best interest of Centeq and [United], to the detriment of Warwick Towers and inconsistent with the goals of the Warwick Counsel [sic]. This control contributed to Warwick Counsel's [sic] refusal to make the financial expenditures necessary in order

to provide adequate security in the very parking garage at issue.

Siegler, however, fails to back up this conclusion with any facts. From Green's affidavit alone, we cannot reasonably infer that Centeq was electing representatives to the board of directors and then influencing them to vote against providing adequate security. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993) ("[W]e are not empowered to convert mere suspicion or surmise into some evidence.").

was entirely distinct from the power to control security. The only "control" wielded by Centeq related to its majority vote in electing board members, not to the rendering of decisions affecting security measures. Centeq had no direct power to make security decisions, and consequently, its influence, if any, upon the Warwick Council was too attenuated to constitute "specific control over the safety and security of the premises." *See Exxon,* 867 S.W.2d at 23. In short, Siegler asserts no facts that would tend to show that Centeq used the Warwick Council as a mere conduit to implement a policy of its own choosing. Given the evidence before us, we do not consider it a fair inference that Centeq had specific control over the security at the Warwick Towers.

 Siegler also asserts that Centeq held itself out as an agent of the Warwick Towers through advertisements and the occupation of a sales and leasing office in the Warwick Towers, but this issue is immaterial to our resolution of this case.[3] Even assuming that Centeq was a leasing agent for the Warwick Towers, that issue would not be dispositive. As we stated in *Exxon,* "the court's inquiry must focus on who had specific control over the safety and security of the premises, rather than on the more general right of control over operations." *Exxon,* 867 S.W.2d at 23. The material issue is whether Centeq had control over security decisions. Before we will impose the duty to protect against the criminal acts of third parties, we must find that the defendant had specific control over the security of the premises where the criminal act took place. *Id.* ("If Exxon did not have any right to control the security of the station, it cannot have had any duty to provide the same."). While the Warwick Council may have had specific control over the security of the parking garage at the Warwick Towers, Centeq did not. On this record, we conclude that Centeq had no legal duty to protect Siegler from the criminal acts of a third party.

**3.** It is also undisputed that Centeq was not Siegler's leasing agent, nor did Siegler live in one of

the United-owned units.

We accordingly reverse the judgment of the court of appeals and render judgment that Siegler take nothing from Centeq.

Justice GAMMAGE, dissenting.

The dispositive issue in this case is whether a material fact issue was raised that the condominium complex majority owner's proxy holder had effective control over the complex's board-directed security measures to such an extent that it can be held liable for the alleged negligence in security decisions made. Because I agree with the court of appeals that the plaintiff's summary judgment evidence raised a fact issue regarding actual control, I dissent.

In analyzing the elements of a negligence cause of action, the first inquiry is whether the defendant owed a duty to the plaintiff. *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex. 1993). As the court of appeals noted, duty is generally "a question of law for the court to decide from the *undisputed facts* surrounding the occurrence in question." 874 S.W.2d at 308 (quoting *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 312 (Tex.1983)) (emphasis added). When facts are in dispute, however, the question of duty becomes one of fact for the fact finder. *Bennett v. Span Industries, Inc.,* 628 S.W.2d 470, 474 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.).

Although a party generally has no duty to protect against the criminal acts of third parties who do not act under the party's supervision or control, *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987), such parties sometimes may be held liable if the criminal act occurs on their premises. *See, e.g., Nixon v. Mr. Property Management,* 690 S.W.2d 546, 550; *Walkoviak v. Hilton Hotels Corp.,* 580 S.W.2d 623, 625 (Tex.Civ. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Morris v. Barnette,* 553 S.W.2d 648, 649–50 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.). The theory underlying these cases is that a party who has the power or right of control over a premises has a duty to provide protection against the foreseeable criminal acts of third persons on the premis-

es. *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993); *Morris,* 553 S.W.2d at 649; *LaFleur v. Astrodome–Astrohall Stadium,* 751 S.W.2d 563 (Tex.App.—Houston [1st Dist.] 1988, no writ). "[W]hen the facts are disputed, the issue of control is one of fact that must be decided by the trier of fact." *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 526 (Tex.1990) (citations omitted).

To support its summary judgment motion, Centeq offered the affidavit of Carla Van Over, Centeq's president and member of the Warwick Council, stating that Centeq had no relationship with and did not own, control or manage Warwick Towers. Siegler's summary judgment evidence consisted of an affidavit from a person purporting to have personal knowledge of material facts, Donna Green. Green attested that Centeq acted as an agent of the majority homeowner of Warwick Towers, controlled the votes on the Warwick Council which controlled site security, and held itself out to be the agent or representative of Warwick Towers through advertisements, phone listings, and by maintaining an office in Warwick Towers. Because these facts are in dispute, the question of duty is one of fact, making the case inappropriate for disposition through summary judgment.

Petitioner Centeq maintains that *Dutcher v. Owens,* 647 S.W.2d 948 (Tex.1983), is dispositive on the liability of a condominium co-owner for injuries sustained in the "common areas" of the complex. *Dutcher,* however, is distinguishable from this case. First, the condominium co-owner in *Dutcher* stipulated to liability. "[T]he sole issue for determination on appeal was whether a condominium co-owner is jointly and severally liable or is liable only for a *pro rata* portion of the damages." *Dutcher,* 647 S.W.2d at 949. No party has admitted liability in this case. Second, this Court acknowledged in *Dutcher* that "[g]iven the uniqueness of the type of ownership involved in condominiums, the onus of liability for injuries arising from the management of condominium projects should reflect the degree of control exercised by the defendants." *Id.* at 950. We declined to find liability in the co-owner in *Dutcher* based

upon the reasoning in a similar California case, *White v. Cox,* 17 Cal.App.3d 824, 95 Cal.Rptr. 259 (1971). We agreed with the court in *White,* when it held that "to rule that a condominium co-owner had any effective control over the operation of the common areas would be to sacrifice 'reality to theoretical formalism,' for in fact a co-owner has no more control over operations than he would have as a stockholder in a corporation which owned and operated the project." *White,* 95 Cal.Rptr. at 263. Here, however, unlike the co-owner in *Dutcher,* co-owner United Savings owned a majority interest in Warwick Towers and purportedly did exercise control over site operations and security with its majority vote. United Savings gave the power to vote its controlling interest in Warwick Towers to Centeq Realty, vesting *de facto* control of Warwick Towers and the Warwick Council in Centeq.

If a party with the "power of control or expulsion ... by reason of location, mode of doing business, or observation or past experiences should reasonably anticipate criminal conduct on the part of third persons ... [that party] has a duty to take precautions against it." *Exxon Corp.,* 867 S.W.2d at 21; *see also Moody v. Cawdrey & Assoc., Inc.,* 6 Haw. App. 355, 721 P.2d 708, 713 (1986) (relying on *White v. Cox*). The party with control of security measures and other matters relating to Warwick Towers is Warwick Council. If the summary judgment evidence indicates that the Council is effectively controlled by Centeq, as the agent of the majority homeowner with the power to select a majority of the Warwick directors, Centeq has **potential** control over the directors and their votes on association matters such as security. The fact issue to be decided is whether or not Centeq exercised that control to influence security measures.

If Warwick Council, as a board of independent co-owners, could not exercise its independent judgment because the majority of directors were selected by one entity, the Council was not exercising its own judgment but that of the controlling entity. Under such circumstances the controlling entity should be liable for the Council's actions which it controlled, much as the shareholders

of a close corporation who have a controlling vote can be held personally liable. *See* TEX. CLOSE CORP.LAW, TEX.BUS.CORP. ACT art. 12.37(c); *Exxon Corp.,* 867 S.W.2d at 21.

The majority notes that this Court also recognizes the "alter ego" theory for disregarding the corporate fiction, but refuses to apply it in this case.

Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. *First Nat'l Bank in Canyon v. Gamble,* 134 Tex. 112, 132 S.W.2d 100, 103 (1939). It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the **amount of financial interest, ownership and control the individual maintains over the corporation,** and whether the corporation has been used for personal purposes. (citations omitted) (emphasis added).

*Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986). The "alter ego" doctrine was created as an equitable, fact-specific approach. When adherence to the corporate fiction creates an inequitable result, courts will disregard the corporate fiction. Before we can address the equity issue, we must determine if Centeq had control over the Council. Whether the relationship between Centeq and the Council satisfies the test for "alter ego" is a fact question to be submitted to the jury. *Id.* at 273; *Airflow Houston, Inc. v. Theriot,* 849 S.W.2d 928 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Gensco, Inc. v. Canco Equip., Inc.,* 737 S.W.2d 345 (Tex.App.—Amarillo 1987, no writ). The existence of this material fact issue also makes this case inappropriate for disposition by summary judgment.

Upon viewing the evidence in the light most favorable to the nonmovant, I believe that a fact issue exists whether Centeq, which had the majority votes for directors, exercised control over those directors and influenced their votes on security measures.

For these reasons, I would affirm the court of appeals and remand the cause to trial.