90 S.W.3d 810 (2002)
OLD AMERICAN COUNTY MUTUAL FIRE INSURANCE COMPANY, Appellant,
v.
Michael D. RENFROW; CD Consulting & Operating Company; Ann Roberts, Indiv. and as Personal Representative of The Estate of Milli Jo Roberts, as next Friend of Mason House, a Minor; and Frank House as next Friend of Justin House and Megan House, Minors, Appellees.
No. 2-00-438-CV.
Court of Appeals of Texas, Fort Worth.
August 15, 2002.
Rehearing Overruled October 3, 2002.
Publication Ordered November 27, 2002.
*812 Shannon, Gracey, Ratliff & Miller, L.L.P., and Joseph W. Spence and John Christopher Nickelson, Fort Worth, for Appellant.
Simpson & Boyd and Derrick S. Boyd and Michael A. Simpson, Decatur; Cantey & Hanger, L.L.P. and John C. Stewart, Fort Worth; Kendall W. Hill, Bedford, for Appellees.
PANEL B: DAY, DAUPHINOT, and HOLMAN, JJ.

OPINION
LEE ANN DAUPHINOT, Justice.

I. INTRODUCTION
Appellant Old American County Mutual Fire Insurance Company ("Old American") filed a declaratory action seeking to determine whether an employee was covered under his employer's commercial auto liability policy. This appeal follows the trial court's summary-judgment determination that coverage existed. In nine issues on appeal, Old American argues that: (1) the trial court erred in concluding that the employee was covered under the policy; (2) the trial court erred in failing to find, as a matter of law, that no coverage existed; (3) the trial court erred in granting summary judgment on a breach of contract counterclaim; (4) the case should not have been transferred from Dallas County to Wise County; and (5) enforcing coverage for an award of punitive damages violates public policy. Because we determine that a fact question exists regarding whether the employee was covered under his employer's insurance policy at the time of the accident that is the basis of the suit, we reverse and remand for trial on the merits.

II. BACKGROUND
In February 1999, Michael Renfrow ("Renfrow") worked as a laborer for CD Consulting & Operating Company ("CD Consulting"), an oil field services company in Bridgeport, Texas. Among the services CD Consulting provides is a "flow back" operation. In such an operation, CD Consulting employees monitor the flow of water out of a well over a period of two or three days. On February 19, 1999, a Friday, Renfrow and another employee were assigned to a flow back operation near *813 Justin, Texas. The two worked at the well site all that day, returning to CD Consulting's offices at around 7:00 p.m. in the evening. According to company policy, employees working a flow back operation are permitted to take a company truck home for the evening when they must be back at the well site early the next morning. Because he was to return to the well site on Saturday at 6:00 a.m., Renfrow took a company truck home Friday evening.
CD Consulting prohibited its employees from using company vehicles for any personal business. Renfrow was aware of this policy. Nevertheless, when Renfrow left work on Friday he went to the home of Milli Jo Roberts instead of his own home. At some point in the night, Renfrow and Roberts traveled to Saginaw, Texas, in CD Consulting's truck. While returning to Bridgeport at approximately 12:45 a.m., Renfrow and Roberts were involved in a single-vehicle accident in which the company truck struck a dirt embankment. Roberts sustained fatal injuries in the accident.
Ann Roberts, individually, on behalf of one of Milli Jo Roberts's three children, and as representative of Milli Jo's estate, and Frank House, on behalf of two of Milli Jo Roberts's children, (collectively "Roberts/House parties") brought a wrongful death suit against Renfrow and CD Consulting. The jury found Renfrow responsible and awarded $655,000 in actual and punitive damages. The jury did not assign any liability to CD Consulting.
At the time of the accident, CD Consulting maintained a commercial automobile insurance policy with Old American. After the trial court entered a judgment in the wrongful death suit, Old American filed a separate declaratory action seeking judicial determination of whether Renfrow was covered by the policy. In the declaratory action, the Roberts/House parties counterclaimed for breach of contract, seeking to have Old American ordered to satisfy the judgment against Renfrow. All parties sought summary judgment in the declaratory action. The trial court determined that Renfrow was an insured at the time of the accident and ordered Old American to satisfy the judgment against Renfrow.

III. LEGAL ANALYSIS

A. Summary Judgment
In its first seven issues, Old American complains that the trial court erred in granting summary judgment for the appellees and in denying its motion for summary judgment.

1. Standard of Review
In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[1] The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.[2] Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.[3]
*814 In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true.[4] Evidence that favors the movant's position will not be considered unless it is uncontroverted.[5]
A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established.[6] The defendant as movant must present summary judgment evidence that negates an element of the plaintiff's claim. Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant.[7] A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.[8] To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law.[9]
When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented.[10] The reviewing court should render the judgment that the trial court should have rendered.[11]

2. Insurance Policy Interpretation
The general rules of contract construction govern the interpretation of insurance policies.[12] A contract is unambiguous if it can be given a definite or certain legal meaning.[13] However, if the contract is subject to more than one reasonable interpretation, then the contract is ambiguous and it will be interpreted in favor of coverage for the insured.[14]
A policy is ambiguous only when there is a "genuine uncertainty as to which one of two or more meanings is proper."[15] Whether the policy is ambiguous is a question of law for the court.[16] However, not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity.[17] "Both the insured and the insurer are likely to take conflicting views *815 of coverage, but neither conflicting expectations nor disputation is sufficient to create an ambiguity."[18] Terms in contracts are to be given their plain, ordinary meaning unless the contract shows that particular definitions are used to replace the ordinary meaning.[19]

3. Coverage
Old American argues that it has no duty to indemnify Renfrow because he was not covered under CD Consulting's commercial insurance policy on the night of the accident. Specifically, Old American contends that the trial court ignored the plain language of the insurance policy as well as settled Texas law when it determined that Renfrow was an insured and failed to determine, as a matter of law, that he was not. The Roberts/House parties respond that the plain language of the policy dictated that the trial court find Renfrow to be an insured.
To determine whether the trial court erred in deciding that Renfrow was an insured under CD Consulting's policy, we must construe the policy's omnibus clause. In that clause, the policy defines an insured as the policyholder and "anyone else while using with your permission a covered auto." The parties present fundamentally differing interpretations of the term "permission" as used in this clause. Old American contends that built into the definition of "your permission" are time, place, and manner of use components. Conversely, the Roberts/House parties contend that because the policy does not define permission, the policy requires only that a driver have authorization to drive the vehicle to be covered, not that the driver also be acting within the scope of authorization given.
Case law supports Old American's position. In 1979, the Texas Supreme Court announced that in cases where the evidence establishes that a driver has at least some permission to use a company vehicle, the question becomes whether the actual use at the time and place of the accident constituted a deviation for personal pleasure sufficient to avoid coverage under an omnibus clause.[20] The court further explained that:
There are three different approaches to the problem of deviation in the United States. They are usually referred to as: (1) the "strict" or "conversion" rule, (2) the "liberal" rule, and (3) the "minor deviation" rule. Under the "strict" rule, the actual use at the time of the accident must be within the time limits and geographical area specified or contemplated by the parties, otherwise permission cannot be found to exist. Under the "liberal" rule, coverage is extended so long as the vehicle was originally entrusted by the named insured to the person operating it at the time of the accident. The only essential thing is that permission be given for use of the vehicle in the first instance and coverage remains afforded irrespective of how gross the deviation from the original bailment. The third position is somewhat between these two extremes and the courts applying this rule modify the strict rule to the extent that protection will be afforded if the use is not a material or gross violation of the terms of the initial permission. Under this rule, the *816 court must determine in each instance taking into account the extent of deviation in actual distance or time, the purposes for which the vehicle was given, and other factors [to determine] whether the deviation was "minor" or "material."[21]
With these doctrinal distinctions set forth, the court adopted the intermediate or "minor deviation" rule, noting that "[u]nder this rule the relationship of the parties and the scope of the initial permission is very important."[22]
The Roberts/House parties, however, argue that the minor deviation rule does not apply in the present case because the omnibus clause here is materially different from the one examined in Coronado. In Coronado, the court described the omnibus clause of the policy as providing coverage to an employee while using one of the company vehicles with the permission of the company, provided the employee's "actual operation is within the scope of such permission."[23] The Roberts/House parties contend that the Coronado court's application of the minor deviation rule was grounded on the omnibus clause's inclusion of scope of permission language.
Here, the omnibus clause does not contain an explicit scope of permission limitation. The Roberts/House parties ask us to decline to apply the minor deviation rule because "[t]he plain language of the policy simply requires that the driver have permission, not that the driver have permission and be acting within the scope of that permission." We do not find the distinction between the omnibus clause here and the one construed in Coronado to be as important as the Roberts/House parties claim.
First, we note that the policy interpretation that the Roberts/House parties urge tracks the liberal rule of deviation. The liberal rule, again, essentially ignores the scope of permission and looks only for whether the vehicle was originally entrusted by the named insured to the person operating it at the time of the accident.[24] In its discussion of the relative merits of the three approaches to the problem of deviation, the Coronado court observed that it had previously rejected the rationale of the liberal rule.[25] One of the cases cited by the Coronado court as a rejection of the liberal rule, Royal Indemnity Company v. H.E. Abbott & Sons, Inc., construed an omnibus clause that extended coverage to "anyone using the vehicle with the permission of the named insured."[26] It appears that, like the omnibus clause before us, the clause that the Royal Indemnity court interpreted contained no scope limitations. Yet, the Royal Indemnity court nevertheless undertook an analysis to determine whether the employee-driver, who had permission to use his employer's vehicle while working, had implied permission to take the vehicle for a personal errand.[27] So, contrary to the Roberts/House parties' contention, even in the absence of an explicit scope provision in an omnibus clause, Texas courts have refused to apply the liberal rule and have engaged in a scope-of-permission analysis.
Thus, we are convinced that the fact that the Coronado omnibus clause contained an explicit scope limitation while *817 the clause before us does not constitutes a distinction without a difference. Coronado itself supports this conclusion inasmuch as the court described the omnibus clause in Royal Indemnity, which did not apparently contain a scope limitation, as "similar" to the one before it, which, again, only extended coverage provided that use was within the scope of permission.[28] Moreover, our conclusion is supported by the accepted definition of permission: "The law is well settled in Texas that permission means consent to use the vehicle at the time and place in question and in a manner authorized by the owner, either express or implied."[29]
Because we reject the Roberts/House parties' argument that the policy provides coverage whenever the driver has some permission, whether or not he is acting within the scope of that permission, we hold that the trial court was required to engage in a minor deviation analysis to determine whether coverage existed at the time of Renfrow's accident. Under this rule, the court must "tak[e] into account the extent of deviation in actual distance or time, the purposes for which the vehicle was given, and other factors [to determine] whether the deviation was `minor' or `material.'"[30]
The summary judgment evidence consisted mostly of deposition and affidavit testimony. A sworn statement Renfrow made before suit was filed was also included. In that statement, Renfrow admitted that: (1) on more than one occasion he had been orally told not to use the truck for personal use; (2) on the night of the accident he did not have permission to drive the company truck on a personal errand to Roberts's house; and (3) at the time of the accident he was operating the truck without permission and for purely personal reasons. In his testimony in the wrongful death suit, Renfrow again stated that he did not have permission to drive on the night of the accident and also admitted that he would occasionally drive home in a company vehicle after drinking at the home of Jimmy Joe Stinnett, CD Consulting's head foreman.
By affidavit, Stinnett testified that the company owner, Robert Carpenter, "would routinely reemphasize to the crews the company policy concerning the prohibition of personal use of company vehicles." Stinnett also testified that Renfrow told him that he knew he did not have permission to use the company vehicle for personal use on the night of the accident. Similarly, Susan Messick, CD Consulting's secretary, and Bobby Scheller, another CD Consulting foreman, testified by affidavit that Renfrow told them that he did not have permission to take the company truck on a personal errand on the night of the accident. Messick also stated that Carpenter had previously reprimanded Renfrow for using a company vehicle for personal reasons.
In deposition testimony, Carpenter explained that when an employee was given permission to take a company truck home when working a flow back operation, the employee's use of the vehicle was limited to driving home in the evening, driving to the home of a co-worker the next morning, and then driving straight to the well site. He also testified that Renfrow had previously violated company policy and taken a company vehicle home "a couple of times" *818 and had been reprimanded for doing so. After these incidents, however, Carpenter did not rescind permission to Renfrow to take a truck home on nights before he had to return early to a well site for a flow back operation.
In a deposition, Stinnett testified that he did not know of a company policy allowing an employee to take a company vehicle home during a flow back operation. He also testified that he was not aware of Renfrow ever using a company vehicle for personal errands. Stinnett characterized Renfrow as his best friend.
Conversely, Ann Roberts, Milli Jo's mother, testified in her deposition that in the two or three weeks before the accident in which her daughter was killed, Renfrow drove a "company truck" to visit her daughter at least sixteen times. However, she could not describe the truck other than as "a white half-ton pickup." She did not recall seeing any writing or other identifying marks on the truck.
We hold that this evidence established as a matter of law that Renfrow did not have express permission to drive the company vehicle in the manner and at the time and place he did the night of the accident. However:
[w]hile express permission must be affirmatively stated, implied permission may be inferred from a course of conduct or relationship between the parties in which there is mutual acquiescence or lack of objection signifying consent. It is usually shown by usage and practice of the parties over a period of time preceding the occasion on which the automobile was being used.[31]
The evidence that Renfrow had been regularly using his employer's vehicle for personal business for the two or three weeks prior to the accident goes to usage and practice and suggests possible acquiescence on the part of CD Consulting. The testimony that Renfrow drove a company vehicle to and from the home of his immediate boss for social visits also raises questions about usage and practice. The testimony of Renfrow and Ann Roberts is sufficient in this summary judgment analysis to raise a fact issue as to implied permission. Thus, while the Roberts/House parties were not entitled to judgment that coverage existed at the time of the accident, Old American was not entitled to judgment that coverage did not exist. The trial court erred in entering summary judgment for the Roberts/House parties, but did not err in denying Old American's motion for summary judgment.

4. BREACH OF CONTRACT
Old American further asserts that the trial court erred in granting summary judgment on the Roberts/House parties' breach of contract counterclaim. The breach of contract counterclaim was based on Old American's failure to satisfy the judgment against Renfrow. A party injured by an insured is a third-party beneficiary of a liability insurance policy and can sue to enforce the policy directly against the insurer once it has been established, by judgment or agreement, that the insured has a legal obligation to pay damages to the injured party.[32]
Because we have determined that a fact issue exists regarding whether Renfrow was an insured under the Old American policy, it has not been established that Old *819 American is responsible for the judgment against Renfrow. Thus, the trial court was premature in granting summary judgment on the breach of contract counterclaim.
Because we have held that a fact issue exists as to whether Renfrow was an insured under the policy, we sustain Old American's first, second, fourth, fifth, and sixth issues. Because we have held that the trial court did not err in denying Old American's motion for summary judgment, we overrule Old American's third and seventh issues.

B. Venue
Old American claims that the trial court in which suit was originally filed, the 95th Judicial District Court of Dallas, erred when it granted the Roberts/House parties' motions to transfer venue to Wise County. Actions for declaratory judgments are governed by the established rules relating to venue of civil actions generally.[33]
If venue is not proper in the county where suit is filed, a trial court must transfer the case to a county where venue is proper.[34] But if a plaintiff files suit in a county of proper venue, it is reversible error to transfer venue under section 15.063(1) even if the county of transfer would have been proper if originally chosen by the plaintiff.[35] In order to determine whether there was reversible error in a case, an appellate court is obligated to conduct an independent review of the entire record.[36]
Section 15.002(a) of the civil practice and remedies code, the general venue statute, provides that venue is proper:
(1) in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred;
(2) in the county of defendant's residence at the time the cause of action accrued if defendant is a natural person;
(3) in the county of the defendant's principal office in this state, if the defendant is not a natural person; or
(4) if Subdivisions (1), (2), and (3) do not apply, in the county in which the plaintiff resided at the time of the accrual of the cause of action.[37]
According to Old American, because the insurance contract at issue was entered into in Dallas County, venue is proper in Dallas County. Specifically, relying on section 15.002(a)(1), Old American contends that contract formation constituted a "substantial part of the events or omissions giving rise to Old American's declaratory judgment lawsuit." We cannot agree. Certainly there could not be a suit had the contract not been formed, and thus the acts constituting contract formation are among the events giving rise to the lawsuit. However, the suit was concerned with construing the contract in light of a discrete set of events. All of these events, discussed more fully above in the coverage section, took place in Wise County. The accident occurred there, any *820 permission given to Renfrow to drive CD Consulting's truck originated there, and the underlying wrongful death lawsuit was heard there. We conclude that, given these facts, it cannot be said that a substantial part of the events giving rise to the declaratory suit occurred in Dallas County.
Old American bases its argument in part on a case from the Dallas Court of Appeals holding that in a suit based on a contract, venue can be maintained in the county where the agreement was made.[38] That case, however, was decided under a prior venue statute, which provided that venue was proper in any county "in which all or part of the cause of action accrued."[39] We decline to ignore the clear language of the statute in effect at the time of the lawsuit, which provides that venue is proper "in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred."[40] The present provision does not allow for venue merely because some events giving rise to a cause of action occurred in a particular county. Thus, the Dallas court did not err in transferring the case to Wise County. We overrule Old American's eighth issue.

C. Punitive Damages
In its ninth issue, Old American complains of the trial court's order that it satisfy the judgment against Renfrow because the judgment reflects an award of punitive damages. According to Old American, requiring an insurer to pay punitive damages assessed to an insured is against public policy. However, because we have determined that a fact question still exists regarding whether Renfrow was an insured at the time of the accident, we do not reach the question of the propriety of the award of punitive damages.

D. Evidence
The Roberts/House parties present a conditional cross point claiming that the trial court erred in failing to consider certain summary judgment evidence. The parties only ask us to reach the point, however, if we determine that Old American was entitled to summary judgment. Because we have held that Old American's motion for summary judgment was correctly denied, we do not reach this point.

IV. CONCLUSION
Having determined that the trial court erred in granting the Roberts/House parties' motions for summary judgment on both the coverage question and the breach of contract claim, we reverse the judgment of the trial court as to those issues. Because the trial court did not err in denying Old American's motion for summary judgment on the coverage question, the judgment is undisturbed in that respect. The case is remanded for a determination by a fact-finder of whether Renfrow had implied permission to use the company truck for personal business on the night of the accident.
NOTES
[1] Tex.R. Civ. P. 166a(c); KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex.1999); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979).
[2] Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.1999); Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996); Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex.1965).
[3] Great Am., 391 S.W.2d at 47.
[4] Rhone-Poulenc, 997 S.W.2d at 223; Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 173 (Tex.1995).
[5] Great Am., 391 S.W.2d at 47.
[6] Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex.1999).
[7] Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex.1995).
[8] KPMG Peat Marwick, 988 S.W.2d at 748.
[9] Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 121 (Tex.1996).
[10] FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex.2000).
[11] Id.
[12] Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex.1997).
[13] Id.
[14] Id.
[15] R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 519 (Tex.1980); see also State Farm Lloyds, Inc. v. Williams, 791 S.W.2d 542, 545 (Tex.App.-Dallas 1990, writ denied).
[16] Coker v. Coker, 650 S.W.2d 391, 393-94 (Tex.1983).
[17] Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex.1994).
[18] Id.
[19] Western Reserve Life Ins. v. Meadows, 152 Tex. 559, 261 S.W.2d 554, 557 (1953), cert. denied, 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954).
[20] Coronado v. Employers Nat. Ins. Co., 596 S.W.2d 502, 504 (Tex.1979).
[21] Id.
[22] Id. at 505.
[23] Id. at 504.
[24] See id.
[25] Id.
[26] 399 S.W.2d 343, 344 (Tex.1966).
[27] Id. at 344-46.
[28] Coronado, 596 S.W.2d at 504.
[29] Hartford Acc. & Indem. Corp. v. Lowery, 490 S.W.2d 935, 937 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.).
[30] Coronado, 596 S.W.2d at 504.
[31] Royal Indem. Co., 399 S.W.2d at 345.
[32] State Farm County Mut. Ins. Co. v. Ollis, 768 S.W.2d 722, 723 (Tex.1989); Great Am. Ins. Co. v. Murray, 437 S.W.2d 264, 265 (Tex. 1969).
[33] Gulf Coast Bus. Forms, Inc. v. Tex. Employment Comm'n, 493 S.W.2d 260, 262 (Tex. Civ.App.-Beaumont), writ ref'd n.r.e., 498 S.W.2d 154 (Tex.1973).
[34] TEX. CIV. PRAC. & REM.CODE ANN. § 15.063(1) (Vernon 1986).
[35] Wilson v. Tex. Parks & Wildlife Dep't, 886 S.W.2d 259, 261 (Tex.1994); Acker v. Denton Pub. Co., 937 S.W.2d 111, 115-16 (Tex.App.-Fort Worth 1996, no writ).
[36] TEX. CIV. PRAC. & REM.CODE ANN. § 15.064(b); Wilson, 886 S.W.2d at 261; Ruiz v. Conoco, Inc., 868 S.W.2d 752, 757 (Tex.1993).
[37] TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(a) (Vernon Supp.2002).
[38] Procter v. Foxmeyer Drug Co., 884 S.W.2d 853, 863 (Tex.App.-Dallas 1994, no writ).
[39] Id.; see also Act of May 17, 1985, 69th Leg, R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3247 (amended 1995) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(a)).
[40] See Tex. Civ. Prac. & Rem.Code Ann. § 15.002(a).