COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-227-CV

 

 

SALLY B. STUTES                                                               APPELLANT

 

                                                   V.

 

TODD SAMUELSON, M.D.                                                       APPELLEE

 

                                              ------------

 

           FROM THE 348TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction

In two issues, Sally B. Stutes (AStutes@)
asserts that the trial court erred in dismissing her suit against Todd
Samuelson, M.D., due to the lack of a physician-patient relationship.  We affirm.

 

 








II. 
Background

In November of 2000, Stutes, a registered nurse,
found a knot in the area of her right collarbone.  Her primary care physician referred her to
Dr. Michael Korenman, a general surgeon. 
He recommended a surgical open biopsy following his diagnosis of a right
supraclavicular mass, which he felt was probably a swollen benign or malignant
lymph node.  Prior to surgery, Stutes
signed two consent forms, one allowing Dr. Korenman to perform the surgery and
another for another physician to perform a bone marrow aspiration and biopsy,
if required.  Both consent forms allowed
the physician Aand such associates . . . and
other health care providers to perform such other procedures which are
advisable in their professional judgment.@  According to Stutes, the plan that she and
Dr. Korenman had discussed, and what she believed would occur, was to determine
if the mass was malignant, and then following the biopsy, they would jointly
decide what to doCthere was no discussion with her
about removing the mass during the surgery. 
In fact, she testified that she and her husband had decided that if a
malignant mass had to be removed, she would have that done in Oklahoma
City.  There is no evidence in the record
that Dr. Samuelson was aware of any of these plans.













On January 31, 2001, the scheduled surgery
occurred.  During the surgery, Dr.
Korenman located and mobilized the mass in question until it was free except
for connections above and below it.  At
this point, Dr. Korenman stopped and decided that he wanted to Ause
another physician as a sounding board . . . and discuss my thought process at
that point in the case. I had hoped that one of the other general surgeons that
does the same type of work as I do would have been in the operating suite, but
. . . they were not at that point.@  As a result, a circulating nurse asked Dr.
Samuelson, who was in the midst of surgery in the adjacent operating room, to Apoke
your head into [Korenman=s] room when you=re
finished with your case.@ 
A few minutes later, after removing his surgical gloves and gown and
putting on his watch and ring, Dr. Samuelson went to the operating room of Dr.
Korenman and inquired what Dr. Korenman wanted. 
At this point, Dr. Samuelson had no knowledge of Stutes or her
surgery.  Dr. Korenman asked questions
about the general anatomy of the area and landmarks used to identify lymph
nodes.  The physicians>
recollections differed as to whether Dr. Samuelson offered to scrub-in and
assist.  Nevertheless, Dr. Samuelson did
not scrub-in and did not enter the surgical field but came within three to five
feet of the patient, behind Dr. Korenman, which was not close enough to observe
the surgical wound clearly.  Also,
according to Dr. Korenman=s operative report, AI asked
the ear, nose and throat physician [Dr. Samuelson, whose name does not appear
in the report] to look in, and it was our opinion that this was a high
probability malignant lymph node, and needed to be excised.@  Dr. Samuelson recalled that he was asked to
clarify the location of certain muscles and nerves and to confirm that the mass
could be a lymphoma, but he also indicated that it could be a nerve-type tumor,
which would include neuromas and schwannomas. 
This was the end of Dr. Sameulson=s
involvement.  Following their discussion,
Dr. Korenman decided that his original opinion was correct and that he had not
penetrated too deeply to put the brachial plexus layer at risk.

Dr. Korenman then proceded with the surgery,
removed the mass, and sent it to pathology. 
It was determined to be a benign schwannoma with two nerve fragments
attached.  Following the surgery, Dr.
Samuelson did not prepare or join in an operative report, did not speak to
Stutes, and did not bill for any professional services.  Dr. Korenman testified that he did not intend
to create a physician-patient relationship between Dr. Samuelson and Stutes,
that his conversation with Dr. Samuelson was not determinative, and that the
decision to remove the mass was his alone. 
Dr. Samuelson testified that he expected Dr. Korenman to believe what he
told him and to rely on the information he provided to him.








Subsequently, Stutes sued the two physicians and
Korenman, P.A., and others who were later non-suited, due to Apain,
mental anguish, and loss of motor function, and numbness in her right arm and
hand@ along
with Adisfigurement,
physical impairment, and other injuries and damages@
resulting from the surgery.  A settlement
was reached with Dr. Korenman and Korenman, P.A., and the trial court granted
Dr. Samuelson=s Atraditional@ motion
for summary judgment based on the absence of a physician-patient relationship
between Stutes and Dr. Samuelson.  This
appeal resulted. 

III. 
Standard of Review B Summary
Judgment

In a summary judgment case, the issue on appeal
is whether the movant met his summary judgment burden by establishing that no
genuine issue of material fact exists and that the movant is entitled to
judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Sw. Elec.
Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v.
Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215; Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d
910, 911 (Tex. 1997); Great Am. Reserve Ins. Co. v. San Antonio Plumbing
Supply Co., 391 S.W.2d 41, 47 (Tex. 1965). 
Therefore, we must view the evidence and its reasonable inferences in
the light most favorable to the nonmovant. 
Great Am., 391 S.W.2d at 47.








In deciding whether there is a material fact
issue precluding summary judgment, all conflicts in the evidence are
disregarded and the evidence favorable to the nonmovant is accepted as
true.  Harwell v. State Farm Mut.
Auto. Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).  Evidence that favors the movant's position
will not be considered unless it is uncontroverted.  Great Am., 391 S.W.2d at 47.

A defendant is entitled to summary judgment if
the summary judgment evidence establishes, as a matter of law, that at least
one element of a plaintiff=s cause
of action cannot be established.  Elliott-Williams
Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999). 
The defendant as movant must present summary judgment evidence that
negates an element of the plaintiff=s
claim.  Centeq Realty, Inc. v. Siegler,
899 S.W.2d 195, 197 (Tex. 1995).  Once
the defendant produces sufficient evidence to establish the right to summary
judgment, the burden shifts to the plaintiff to come forward with competent
controverting evidence raising a genuine issue of material fact with regard to
the element challenged by the defendant. 
Id.

IV.  The
Physician-Patient Relationship

The singular question presented to this court is
whether Dr. Samuelson disproved that a physician-patient relationship existed
between Dr. Samuelson and Stutes, and hence summary judgment in his favor was
proper.








To prevail on a health care liability claim, a
claimant must show that the health care provider had a duty to act according to
certain legal standards and that the applicable standard of care was breached,
causing an injury.  Gross v. Burt,
149 S.W.3d 213, 221 (Tex. App.CFort
Worth 2004, pet. denied).  As to a
physician, Amalpractice is predicated on a
physician-client relationship,@ that
is, a physician Acannot be liable for malpractice
unless the physician breaches a duty flowing from a physician-patient
relationship.@ 
St. John v. Pope, 901 S.W.2d 420, 423 (Tex. 1995). The burden of
establishing the existence of this relationship lies with the claimant/patient.  Gross, 149 S.W.3d at 222. Our
Texas Supreme Court has explained,

It is only with a
physician=s consent, whether
express or implied, that the doctor-patient relationship comes into being.  Thus we agree with those cases that hold that
the duty to treat the patient with proper professional skill flows from the consensual
relationship between the patient and physician, and only when that
relationship exists can there be a breach of a duty resulting in medical
malpractice . . . . Creation of the physician-patient relationship does not
require the formalities of a contract. 

 

St. John, 901 S.W.2d at 423-24 (emphasis supplied).








Contractual terms are often used in discussing
the physician-patient relationship.  It
is created when professional services are offered and they are accepted by
another.  See id.  In fact, the relationship is generally
viewed as a voluntary and contractual one, which may be implied or express. Gross,
149 S.W.3d at 222.  The implied
contractual relationship may arise from facts and circumstances indicating
there was a mutual intention to contract. 
Lection v. Dyll, 65 S.W.3d 696, 704 (Tex. App.CDallas
2001, pet. denied).  The consent of the
physician, whether express or implied, is absolutely necessary to the creation
of the relationship.  See Gross,
149 S.W.3d at 222; Majzoub v. Appling, 95 S.W.3d 432, 436 (Tex. App.CHouston
[1st Dist.] 2002, pet. denied).  AIf there
is no prior relationship between the physician and the patient, there must be
some affirmative action on the part of the physician to treat the patient to
create such a relationship.@  Gross, 149 S.W.3d at 221-22 (quoting
Majzoub, 95 S.W.3d at 436).  AMere
recommendations, made by an on-call physician, to be accepted or rejected by a
treating physician do not constitute such an affirmative act.@  Majzoub, 95 S.W.3d at 438.

V.  Case
Law








Several cases have discussed the parameters of
the physician-patient relationship in similar, but not the same, circumstances
as exist here.  In Majzoub, an
on-call physician was called by an emergency room doctor and told about a
patient in the emergency room.  95 S.W.3d
at 434-35.  The on-call doctor answered
questions and made certain recommendations, which were apparently
followed.  Id.  Regarding this conversation, the court, in
affirming a summary judgment in favor of the on-call physician based on the
absence of a physician-patient relationship, observed that (1) the emergency room
physician retained responsibility for the patient and was free to accept or
reject the on-call physician=s
recommendations, (2) the on-call physician made no medical diagnosis or medical
decisions, (3) nothing indicated that either doctor contemplated that the
comments were binding on the emergency room doctor and (4) the on-call
physician did not have the responsibility to control the patient=s
treatment.  Id. at 438.  The court also noted,

The extension of
potential malpractice liability to doctors with whom a treating physician has
merely conferred, without more, would unacceptably inhibit the exchange of
information and expertise among physicians. 
This would benefit neither those seeking medical attention nor the
medical profession.

 

Id.

In Lopez v. Aziz, 852 S.W.2d 303, 304,
306-07 (Tex. App.CSan Antonio 1993, no writ), a
similar result occurred in a suit where a treating physician sought treatment
advice over the phone from an OB-GYN, and followed the advice.  The court observed that the OB-GYN, Dr. Aziz,


did no more than answer
the professional inquiry of a colleague. 
There is no evidence of any consensual basis for the existence of a
physician-patient relationship arising out of that one telephone conversation.
. . . To expose physicians such as Dr. Aziz to liability for simply conferring
with a colleague would be detrimental in the long run to those seeking
competent medical attention and is contrary to the public policy of this state.

 








Id. at 306-07.  The court went on to observe that (1) Dr.
Aziz did not contact, examine, or treat the patient, (2) his opinions
concerning treatment were directed to her treating physician who was free to
accept or reject the recommendations, and (3) the treating doctor acknowledged
that he was ultimately responsible for the patient=s
treatment.  Id.

A different result was reached in Kimber v.
Sideris, 8 S.W.3d 672, 676-78 (Tex. App.CAmarillo
1999, no pet.).  Dr. Sideris was Julia
Kimber=s
pediatric cardiologist, a non-surgeon. 
He was present for the entire surgery of his patient and squeezed in
around the surgical field to observe the surgery, and he was ousted from that
position when he would do so. As to a patch being placed during the surgery, he
complained at least three times that each patch was insufficient and needed to
be replaced.  There was evidence that he
was directing some of the decisions being made during the surgery.  The court found that under these circumstances,
there was evidence that Dr. Sideris was more than an observer, undertook an
affirmative course of action by directing some of the decisions during surgery
and was hence a participant in the surgery, thereby raising a fact question as
to whether Dr. Sideris assumed a duty during the surgery.  Id. 
The court reversed the summary judgment in favor of the doctor and
remanded the case to the trial court.  Id.

VI. 
Application








We hold that under the facts presented, no
physician-patient relationship existed, as proven by Dr. Samuelson.  Dr. Samuelson=s role
was that of a question answerer, and he confirmed the thinking of Dr.
Korenman.  He appeared briefly in the
surgical suite at the behest of Dr. Korenman, did not enter the surgical field,
did not touch the patient, did not scrub-in, was not in a position to direct a
procedure, did not prepare a report, never spoke to the patient, and did not
bill for his time.  Dr. Korenman remained
responsible for the patient, and he testified that he alone made the decision
to proceed with surgery and that his conversation with Dr. Samuelson was not
determinative.  Further, we agree with
the public policy rationale expressed in Majzoub and Lopez; to
hold that a physician-patient relationship could be established in these
circumstances would have a chilling effect on efficient medical care and be
contrary to the public policy of this state.

VII. Conclusion

Having overruled Stutes=s two
issues, we affirm the judgment of the trial court.

 

 

 

BOB
MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON,
WALKER, and MCCOY, JJ.

 

DELIVERED:  November 3, 2005