COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-095-CV

 

 

STEPHANIE DUKES, INDIVIDUALLY,                                     APPELLANTS

STEPHANIE DUKES, AS
INDEPENDENT

EXECUTOR OF THE ESTATE OF
MYRON

DUKES, DECEASED,
STEPHANIE DUKES, 

AS INDEPENDENT EXECUTOR
OF THE

ESTATE OF CHRISTOPHER
DUKES, DECEASED, 

STEPHANIE DUKES, AS
INDEPENDENT

EXECUTOR OF THE ESTATE OF
LAUREN

DUKES, DECEASED, LOTTIE
JAQUESZIAN

DUKES, INDIVIDUALLY,
MYRON JAMAL

DUKES, INDIVIDUALLY, BY
HIS MOTHER

AND NEXT FRIEND, GLENDA
MAGHETT,

ALEXANDRA DEADMON,
INDIVIDUALLY,

FRUENZE DEADMON,
INDIVIDUALLY,

ALEXANDRA DEADMON AND
FRUENZE

DEADMON, AS INDEPENDENT

CO-EXECUTORS OF THE
ESTATE OF 

JUANITRICE DEADMON,
DECEASED,

FRUENZE DEADMON, JR.,
INDIVIDUALLY,

BY HIS PARENTS AND NEXT
FRIENDS,

ALEXANDRA DEADMON AND
FRUENZE 

DEADMON, CAMERON DEADMON,


INDIVIDUALLY, BY HIS
PARENTS AND

NEXT FRIENDS, ALEXANDRA
DEADMON 

AND FRUENZE DEADMON,
GEMMIA 

DEADMON, INDIVIDUALLY, BY
HER 

PARENTS AND NEXT FRIENDS,
ALEXANDRA

DEADMON AND FRUENZE
DEADMON 

 








                                                   V.

 

PHILIP JOHNSON/ALAN
RITCHIE                                            APPELLEES

ARCHITECTS, P.C., PHILIP
JOHNSON, 

RITCHIE & FIORE
ARCHITECTS, P.C.,

ALAN RITCHIE/DAVID FIORE
ARCHITECTS, 

P.C., PHILIP JOHNSON,
ALAN RITCHIE,

DAVID FIORE, PETER
JOHANTGEN,

PETER JOHANTGEN
CONSULTING, INC.,

HUITT-ZOLLARS, INC.,
EMILE KELLER, 

AND AUSTIN COMMERCIAL,
INC.

 

 

                                              ------------

 

           FROM THE 141ST
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I. 
Introduction








In eleven issues, Stephanie
Dukes, Individually; Stephanie Dukes, as Independent Executor of the Estate of
Myron Dukes, Deceased; Stephanie Dukes, as Independent Executor of the Estate
of Christopher Dukes; Stephanie Dukes, as Independent Executor of the Estate of
Lauren Dukes, Deceased; Lottie Jaqueszian Dukes, Individually; Myron Jamal
Dukes, Individually, by his Mother and Next Friend, Glenda Maghett; Alexandra
Deadmon, Individually; Fruenze Deadmon, Individually; Alexandra Deadmon and
Fruenze Deadmon, as Independent Co-Executors of the Estate of Juanitrice
Deadmon, Deceased; Fruenze Deadmon, Jr., Individually, by his Parents and Next
Friends, Alexandra Deadmon and Fruenze Deadmon; Cameron Deadmon, Individually,
by his Parents and Next Friends, Alexandra Deadmon and Fruenze Deadmon; Gemmia
Deadmon, Individually, by her Parents and Next Friends, Alexandra Deadmon and
Fruenze Deadmon, (hereinafter ADukes@)
appeals the trial court=s granting of summary judgment
to Philip Johnson/Alan Ritchie Architects, P.C., Philip Johnson, Ritchie &
Fiore Architects, P.C., David G. Whitney and Alan Ritchie, Alan Ritchie/David
Fiore Architects, P.C. and David Fiore (collectively AJohnson/Ritchie@); Huitt‑Zollars,
Inc. and Emile Keller (collectively AHuitt/Keller@); Peter
Johantgen and Peter Johantgen Consulting, Inc. (collectively AJohantgen@); and
Austin Commercial, Inc. (hereafter AAustin@).  

II.  Factual
History

This case involves the tragic drowning deaths of
Myron Dukes, Christopher Dukes, Lauren Dukes, and Juanitrice Deadmon on June
16, 2004 in the Fort Worth Water Gardens. 
No one knows exactly how Lauren and Juanitrice initially entered the Active
Water Pool.  Lauren was reportedly the
first to enter the water, and Juanitrice reportedly tried to help her out and
either fell in or jumped in the pool. 
Both Myron and Christopher Dukes drowned after entering the Active Water
Pool in an effort to save the girls. 








Since 1974, the Fort Worth Water Gardens, an
outdoor urban park and water sculpture, have been an architectural favorite and
a source of pride for the City of Fort Worth (ACity@).  The City has owned and controlled the Water
Gardens since the 1970s.  Prior to this
accident, there had been no previous drowning deaths in the Water Gardens. 

The Water Gardens were originally designed by
architects Philip Johnson and John Burgee and were not intended for
swimming.  In the 1990s, the City
determined that it would engage in a restoration and renovation of the Water
Gardens in conjunction with the Fort Worth Convention Center Renovation Project
(AProject@).  The City contracted with Huitt/Keller from
1994-2000 to perform an architectural assessment of the Water Gardens.  In 1999, the City also contracted with
Johnson/Ritchie and Johantgen as consulting architects.  In 2001 through 2002, the City contracted
with Austin to act as a project manager for the Project, adjacent to the Water
Gardens. 








Shortly after the accident, Dukes filed suit
against the City and a number of architectural firms and engineering firms, as
well as individual architects, engineers, and contractors.  Dukes asserted wrongful death, survival, and
bystander claims against multiple defendants. 
Dukes settled with the City in 2005. 
The remaining Appellees are comprised of architectural firms,
engineering firms, and individual architects and engineers who have been
involved over the years with the design or restoration of the Water Gardens. 

III. 
Procedural Background

All of the nonsettling defendants in the
underlying case, including those involved in this appeal, filed motions for
summary judgment.  Each of the defendants
asserted that they owed no duty to the Dukes. 
In addition, Johnson/Ritchie asserted that there was no proximate cause
between their actions and the incident in question and that the Dukes=s claims
were barred by limitations.  On April 10,
2007, the trial court granted summary judgment to all of the aforementioned
parties without specifying the grounds therefor.  This appeal followed.

IV. 
Standard of Review

In a summary judgment case, the issue on appeal
is whether the movant met the summary judgment burden by establishing that no
genuine issue of material fact exists and that the movant is entitled to
judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Sw. Elec.
Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v.
Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215.








When reviewing a summary judgment, we take as
true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant=s favor.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  Evidence
that favors the movant=s position will not be
considered unless it is uncontroverted.  Great
Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47
(Tex. 1965). But we must consider whether reasonable and fair-minded jurors
could differ in their conclusions in light of all of the evidence
presented.  See Wal-Mart Stores, Inc.
v. Spates, 186 S.W.3d 566, 568 (Tex. 2006); City of Keller v. Wilson,
168 S.W.3d 802, 822-24 (Tex. 2005).

The summary judgment will be affirmed only if the
record establishes that the movant has conclusively proved all essential
elements of the movant=s cause of action or defense as
a matter of law.  Clear Creek Basin,
589 S.W.2d at 678.








A defendant who conclusively negates at least one
essential element of a cause of action is entitled to summary judgment on that
claim.  IHS Cedars Treatment Ctr. of
Desoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  Once the defendant produces sufficient
evidence to establish the right to summary judgment, the burden shifts to the
plaintiff to come forward with competent controverting evidence raising a
genuine issue of material fact with regard to the element challenged by the
defendant.  Centeq Realty, Inc. v.
Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

When a trial court=s order granting
summary judgment does not specify the ground or grounds relied on for its
ruling, summary judgment will be affirmed on appeal if any of the theories
presented to the trial court and preserved for appellate review are
meritorious.  Provident Life &
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003); Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995). 

V.  Duty

The primary question in this case is whether
Johnson/Ritchie, Johantgen, Huitt/Keller, and Austin owed a duty to the
decedents.  

A. General Negligence Law








The common law doctrine of negligence consists of
three elements:  (1) a legal duty owed by
one person to another; (2) a breach of that duty; and (3) damages proximately
resulting from the breach.  Greater
Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990).  The threshold inquiry in a negligence case is
duty.  Id.  The plaintiff must establish both the
existence and violation of a duty owed to the plaintiff by the defendant to
establish liability in tort.  Id.  Whether a duty exists is a question of law for
the court to decide from the facts surrounding the occurrence in question.  Timberwalk Apartments, Partners, Inc. v.
Cain, 972 S.W.2d 749, 756 (Tex. 1998); Otis Eng=g Corp.
v. Clark, 668 S.W.2d 307, 312 (Tex. 1983); Pichardo v. Big Diamond, Inc.,
215 S.W.3d 497, 500‑01 (Tex. App.CFort
Worth 2007, no pet.). 

B. Premises Liability Law

Premises liability is a special form of
negligence.  W. Invs., Inc. v. Urena,
162 S.W.3d 547, 550 (Tex. 2005).  A
premises defect cause of action exists if a person is injured as a result of a
condition of the premises.  City
of San Antonio v. Estrada, 219 S.W.3d 28, 32 (Tex. App.CSan
Antonio 2006, no pet.).  Duty is still a
threshold inquiry in a premises liability case, and the duty owed to the
claimant depends on the status of a claimant at the time that the incident
giving rise to the lawsuit occurred.  Centeq Realty, Inc. v. Siegler, 899 S.W.2d
195, 197 (Tex. 1995); Urena, 162 S.W.3d at 550.  This status can be one of an invitee,
licensee, or trespasser.[1]  Alamanza v. Navar, 225 S.W.3d 14, 20
(Tex. App.CEl Paso 2005, no pet.). 








Whether a duty exists to keep the premises in a
safe condition is a question of law for the court to decide based on the facts
and circumstances.  Seaway Prods.
Pipeline Co. v. Hanley, 153 S.W.3d 643, 654 (Tex. App.CFort
Worth 2004, no pet.).  If no duty exists,
then no legal liability for a premises liability claim can arise.  Strunk v. Belt Line Rd. Realty Co., 225
S.W.3d 91, 99 (Tex. App.CEl Paso 2005, no pet.). 

A defendant, who was the owner or occupier of the
premises at the time of the injury, must have had control of the premises to be
liable under premises liability.  Wal-Mart
Stores, Inc. v. Alexander, 868 S.W.2d 322, 324 (Tex. 1993).  Therefore, a plaintiff must prove that the
defendant had control over and responsibility for the premises before a duty
can be imposed on the defendant.  See
County of Cameron v. Brown, 80 S.W.3d 549, 556 (Tex. 2002).  The control that the defendant had over the
premises must relate to the condition or activity that caused the injury.  See Clayton W. Williams, Jr., Inc. v.
Olivo, 952 S.W.2d 523, 527-28 (Tex. 1997). 









Ordinarily a person who does not own the real
property must assume control over and responsibility for the premises before
there will be liability for a dangerous condition existing on the real
property.  City of Denton v. Page,  701 S.W.2d 831, 835 (Tex. 1986); see, e.g.,
Alexander, 868 S.W.2d at 324 (stating that a lessee is responsible for
those areas adjacent to the demised premises which it actually controls).  However, a private person who has created the
dangerous condition or who has agreed to make safe a known, dangerous condition
may be liable even though not in control of the premises at the time of injury.
 Page, 701 S.W.2d at 835. 

VI. Johnson/Ritchie and Johantgen

In issues one through four, Dukes asserts that
the trial court erred by granting summary judgment in favor of Johnson/Ritchie
and Johantgen because  the evidence
demonstrated that there were direct contradictions between the testimony of
Ritchie, Johantgen, and City Supervisor, Richard Zavala; that Johnson/Ritchie
and Johantgen owed duties of care to the public; that Johnson/Ritchie and
Johantgen had actual knowledge of the hazard at the Active Water Pool; and that
their alleged breach of duties contributed to cause the deaths of the
decedents.[2]


 








A. Applicable Facts

The Water Gardens were originally designed by
architects Philip Johnson and John Burgee in 1974.  In 1997, the Water Gardens had been in
operation for twenty-three years and was in need of repair and restoration.  The City considered changing the south wall
of the Water Gardens and sought the input of Johnson/Ritchie to help preserve
the original design.  In December 1997,
Ritchie was invited to Fort Worth to review the proposed changes.  Subsequently, Richard Zavala, director of the
City=s Parks
and Community Services Department, sent a letter on December 9, 1997, to
several individuals, including Johnson/Ritchie, that summarized the meeting
between Ritchie and the City regarding the proposed changes to the Water Gardens.  The letter considered possible design
activity for the Water Gardens if a capital improvement was approved by voters
the following year.  The letter stated
that Johnson/Ritchie would provide a Acomprehensive
review@ of the
Water Gardens, including an assessment of @the
overall condition[s and] various systems, i.e. lighting, mechanical,
electrical, plumbing, etc.@








It was not until two years later, on April 22,
1999, that the City contracted with Johnson/Ritchie to review the Water Garden=s
existing conditions and determine whether the park=s
features were in compliance with the Americans with Disabilities Act (AADA@).  Subsequently, Johnson/Ritchie hired Peter
Johantgen to assist in performing the 1999 review of the Water Gardens.[3]  There was no written contract between
Johantgen and Johnson/Ritchie.  According
to his affidavit testimony, Johantgen=s scope
of work was to include a Alimited visual inspection of the
Water Gardens to document the existing conditions of the site as it relates to
repair and restoration of the site to its original condition along with
possible ADA issues.@ 

Johantgen performed a visual inspection of the
Water Gardens on July 25-27, 1999.  Based
on Johantgen=s review, Johnson/Ritchie
submitted a conditions survey to the City in October 1999.  The City never retained Johnson/Ritchie or
Johantgen to design or implement any of the matters identified in the
conditions survey. 

B. Applicability of Professional Codes of Ethics in a Duty Analysis

The primary question is whether Johnson/Ritchie
and Johantgen owed a duty to the decedents. 
Dukes first contends that Johnson/Ritchie and Johantgen owed a duty to
the decedents because, as professionals, they were under the ethical obligation
to report any unsafe or hazardous conditions that they observed during their
review of the Water Gardens. 








Under Texas law, there is no binding authority to
support Dukes=s proposition that a court must
take into consideration professional codes of ethics when conducting a duty
analysis.  The only case that supports
Dukes=s
position is the concurring opinion of Winters v. Houston Chronicle
Publishing Co., in which Justice Doggett noted that

[b]oth civil and criminal
statutes reflect myriad expressions of the public policy to encourage the
reporting and correction of activities harmful to our citizenry.  This principle is . . . applicable
to licensed professionalsCphysicians, attorneys,
and othersCwhich impose upon them
a duty to report unethical conduct in their profession[.]

 

795 S.W.2d 723, 731-32 (Tex. 1990) (Doggett, J., concurring) (emphasis
added).  However, the Texas Supreme Court
has more recently observed, albeit in a footnote, that the ARules
[of Professional Conduct] do not define standards of civil liability of lawyers
for professional conduct.@  Joe v. Two Thirty Nine Joint Venture, 145
S.W.3d 150, 159 n.2 (Tex. 2004).  Because
we have not found, nor has Dukes cited, any case law to show the contrary, we
determine that professional negligence law has not yet been broadened to
include the evaluation of professional codes of ethics in the determination of
whether a duty is owed.  See id.  Therefore, we conclude that Johnson/Ritchie
and Johantgen had no legal duty arising from their profession as architects to
report safety hazards that they may have discovered in their assessment of the
Water Gardens. 













Dukes next asserts that Johnson/Ritchie and
Johantgen owed a duty of care arising from Johnson/Ritchie=s 1999
contractual relationship with the City.[4]  A contract for professional services gives
rise to a duty by the professional to exercise the degree of care, skill, and
competence that reasonably competent members of the profession would exercise
under similar circumstances.  Averitt
v. Price Waterhouse Coopers L.L.P., 89 S.W.3d 330, 334 (Tex. App.CFort
Worth 2002, no pet.).  In contracting for
personal services, an architect=s or an
engineer=s duty
depends on the particular agreement entered into with his employer.  I.O.I. Sys., Inc. v. City of Cleveland,
Tex., 615 S.W.2d 786, 790 (Tex. App.CHouston
[1st Dist.] 1980, writ. ref=d
n.r.e.).  An engineer or an architect
must use the skill and care in the performance of his duties commensurate with
the requirements of his profession and is only liable for a failure to exercise
reasonable care and skill commensurate with those requirements.  Id.

In this case, we look only to the April 22, 1999
contractual agreement to determine whether Johnson/Ritchie and Johantgen owed a
duty to the decedents.[5]  The scope of Johnson/Ritchie=s duty
is determined by this contract.  See
id. (holding that an architect=s duty
depends on the particular agreement entered into with his employer).  








After reviewing the contract, we determine that
contrary to Dukes=s assertion, the contract did
not require Johnson/Ritchie to address safety issues.  Although Dukes contends that the 1999
agreement was a Acomprehensive review,@ thus
making a safety review necessarily a part of Johnson/Ritchie=s
responsibilities, our review of the agreement shows that it merely stated that
Johnson/Ritchie would provide Aa review
of existing conditions,@ including the Apavement,
steps, and railings@; the Apools=
surfaces, plumbing and lighting@; the Achanges
to the original Water Gardens for compliance with the ADA@; and
development of Aappropriate repair options and
establishing of repair priorities.@[6] Nowhere
does the contract specify that Johnson/Ritchie had any contractual obligation
to report or make safe any hazards that they may have detected in the Water
Gardens.  Therefore, because
Johnson/Ritchie=s duty depends on the contract
they entered into with the City, and because there is no evidence that the
contract required Johnson/Ritchie to report or make safe any hazards detected,
we determine that Dukes=s assertion that Johnson/Ritchie
owed a duty to the decedents arising from Johnson/Ritchie=s
contractual relationship with the City is without merit.  See, e.g., Entex, A Div. of Noram Energy Corp.
v. Gonzalez, 94 S.W.3d 1, 11 (Tex. App.CHouston
[14th Dist.] 2002, pet. denied) (holding that gas provider did not have a
negligence duty arising from its contractual relationship because the contract
only required that the gas provider change the meter and did not require them
to inspect, repair, or warn about the water heater).   








Similarly, the summary judgment evidence shows
that the scope of Johantgen=s duties
did not include a safety review. 
Johantgen=s duty was defined by the scope
of his agreement with Johnson/Ritchie to act as a consultant pursuant to
Johnson/Ritchie=s 1999 contract with the City to
provide a review and assessment of the Water Gardens.  See I.O.I. Sys. Inc., 615
S.W.2d at 790 (holding that in contracting for personal services, an architect=s duty
depends on the particular agreement entered into with his employer).  The summary judgment evidence shows that
Johantgen was asked by Johnson/Ritchie to do a limited visual inspection of the
Water Gardens to document the existing conditions as it related to repair and
restoration of the site to its original condition, along with possible ADA
issues, and that the scope of his work did not include a review of the safety
issues or hazards at the site.  Dukes has
not presented any evidence showing that the scope of Johantgen=s work
included a safety review.  Therefore,
because Dukes has failed to present any evidence showing otherwise, we hold
that Johantgen owed no duty to the decedents to report any safety hazards
observed during Johantgen=s 1999 review of the Water
Gardens.         

C.
Premises Liability













Dukes next argues that Johnson/Ritchie and
Johantgen owed a duty under premises liability law.  Dukes first contends that Johnson/Ritchie and
Johantgen owed a duty because they recognized that there were hazards in the
Water Gardens and that drowning was a foreseeable result of such hazards. In their effort to show that a court may
consider the forseeability[7]
of harm in determining whether the defendant exercised the duty of reasonable
care, Dukes cites Corbin v. Safeway Stores, Inc., 648 S.W.2d 292 (Tex.
1983).  However, the analysis in that
case deals exclusively with the duty that an occupier of premises owes to
invitees.  While there is no dispute that
the decedents were invitees, there is also no dispute that the City was the
owner and occupier in exclusive control of the Water Gardens.  Indeed, aside from Johantgen=s 1999
walk-through of the Water Gardens, Johnson/Ritchie and Johantgen never
conducted any work at the Water Gardens, nor did the City ever contact them to
implement any of the recommendations contained in the conditions survey.  Nor has Dukes presented any evidence
indicating that Johnson/Ritchie or Johantgen had exclusive control over the
Water Gardens.  Therefore, whether
Johnson/Ritchie and Johantgen exercised reasonable care to the decedents is of
no consequence simply because Johnson/Ritchie and Johantgen were neither the
owners of the Water Gardens, nor were they an occupier in exclusive control of
the premises.  See Alexander, 868
S.W.2d at 324; Page, 701 S.W.2d at 835. 
Accordingly, no duty of reasonable care may be imposed upon
Johnson/Ritchie and Johantgen under general premises liability law.  See Alexander, 868 S.W.2d at 324;
Page, 701 S.W.2d at 835.

If the general rule of premises liability is
inapplicable, a party may be held liable under a premises liability analysis
only if the party has agreed to make safe a known, dangerous condition on the
premises and failed to do so or if the party has created the dangerous
condition.  See Page, 701 S.W.2d
at 835.








To determine whether either exception applies, we
examine the summary judgment evidence. 
However, even viewing the evidence in the light most favorable to Dukes,
we determine that neither Johnson/Ritchie nor Johantgen ever expressly or impliedly
agreed to make safe a known, dangerous condition, nor did they create the
dangerous condition.  See id. (evaluating
whether the City of Denton ever expressly or impliedly contracted to remedy any
dangerous condition on the property). 
Johnson/Ritchie=s contract with the City
required them to provide only a review of the Water Gardens=
existing conditions so that the City could repair and restore the Water Gardens
consistent with the original design and to comply with the ADA.  The contract imposed no responsibility upon
Johnson/Ritchie to remedy the problems that they discovered in the course of
their review.  Thus, the contract itself
demonstrates that Johnson/Ritchie never expressly agreed to make safe a known,
dangerous condition, and Dukes has not presented any competent evidence that
would raise a genuine issue of material fact showing otherwise.  See Centeq Realty, Inc., 899 S.W.2d at
197.  Nor has Dukes presented any evidence
raising a genuine issue of material fact that Johnson/Ritchie or Johantgen
impliedly agreed to remedy a known, dangerous condition or that they created
the condition.  








Furthermore, Dukes=s attempt
to analogize this case to Crown Derrick Erectors, Inc. v. Dew, 117
S.W.3d 526 (Tex. App.CBeaumont 2003), rev=d on
other grounds, 208 S.W.3d 448 (Tex. 2006) is misplaced.  In that case, Crown Derrick left a hole in an
elevated rig walkway unguarded except for a small rope barrier.  Id. 
A worker subsequently fell through the hole to his death.  Id.  The court imposed liability only because Crown
Derrick was Aacting to correct a danger it
agreed to correct and that arose out of its own work.@  Dukes argues that just as liability was
imposed on Crown Derrick because it had undertaken to erect a barrier to
protect a dangerous area on its work site, liability should also be imposed in
this case because Johnson/Ritchie and Johantgen Atook
half-steps to address the potential hazard@ by
reporting their observation of algae growth in the 1999 report.[8]  However, the imposition of liability upon
Crown Derrick turns on the fact that it was Aacting
to correct a danger it agreed to correct and that arose out of its own
work.@  See id. at 532 (emphasis added).  As we previously discussed, Dukes has not
raised a genuine issue of material fact that Johnson/Ritchie or Johantgen ever
expressly or impliedly agreed to correct any problems discovered in the course
of their review.  Thus, they had no duty
to correct any potential hazard that they observed. 

After reviewing the evidence, we determine that
Dukes has failed to raise a genuine issue of material fact that either
Johnson/Ritchie or Johantgen agreed to make safe a known, dangerous condition
and failed to do so or that they created the hazardous condition.  See Page, 701 S.W.2d at 835.  Therefore, we determine that no duty was
imposed on Johnson/Ritchie and Johantgen under premises liability law.

D.
Voluntary Undertaking of a Duty








We now turn to Dukes=s third
proposed source of a negligence duty, an undertaking theory.  Dukes contends that Johnson/Ritchie=s 1999
agreement Aclearly state[s] that the
respective assessments were to cover all areas of the Water Gardens@ and
that a Aduty may
be established by a showing that [Johnson/Ritchie and Johantgen] undertook
inspection of the entire park.@ 

The Texas Supreme Court has stated that Aone who
voluntarily undertakes an affirmative course of action for the benefit of
another has a duty to exercise reasonable care that the other=s person
or property will not be injured thereby.@  Colonial Sav. Ass=n v.
Taylor, 544 S.W.2d 116, 119 (Tex. 1976); Tex. Woman=s Univ.
v. Methodist Hosp., 221 S.W.3d 267, 283‑84 (Tex. App.CHouston
[1st Dist.] 2006, no pet.).  If one
undertakes to make the premises safe for others, he or she owes a duty to use
due care to make the premises safe.  Crooks
v. M1 Real Estate Partners, Ltd., 238 S.W.3d 474, 489‑90 (Tex. App.CDallas
2007, pet. filed).  ADue care@ is that
degree of care which a person of ordinary prudence would exercise under the
same or similar circumstances.  Id.  The court in Colonial Savings cited
section 323 of the Second Restatement of Torts, which provides:

One who undertakes,
gratuitously or for consideration, to render services to another which he
should recognize as necessary for the protection of the other=s person or things, is
subject to liability to the other for physical harm resulting from his failure
to exercise reasonable care to perform his undertaking, if (a) his failure to
exercise such care increases the risk of such harm, or (b) the harm 

is suffered because of
the other=s reliance upon the
undertaking.

 








See Colonial Sav. Ass=n, 544
S.W.2d at 128.  Thus, to establish a
negligent undertaking, a plaintiff must show: (1) the defendant undertook to
perform services that it knew or should have known were necessary for the
plaintiff=s protection; (2) the defendant
failed to exercise reasonable care in performing those services; and either (3)
the plaintiff relied upon the defendant=s
performance; or (4) the defendant=s
performance increased the plaintiff=s risk
of harm.  Torrington Co. v. Stutzman,
46 S.W.3d 829, 839 (Tex. 2000); Crooks, 238 S.W.3d at 489‑90. 








In their attempt to persuade this court that
Johnson/Ritchie and Johantgen undertook a duty through their inspection of the
Water Gardens, Dukes cites Torrington Co., 46 S.W.3d at 839.  In that case, Torrington was sued after a
Navy helicopter crashed and killed two Marines. 
Id.  Torrington=s
subsidiary had manufactured the bearing that had failed in the helicopter.  Id. 
After an earlier crash of a civilian helicopter with a similar bearing,
Torrington had written a letter to Bell Helicopter stating that it was Amost
anxious to participate in any evaluation you are currently performing.@  Id.  The letter also stated that Torrington
intended to Acontinue to actively participate
with the [National Transportation Safety Board] in their investigation.@  Id.  The Texas Supreme Court held that Torrington=s letter
to Bell Helicopter was an undertaking of some type.  However, the facts about the scope of the
assumed duty were in dispute, and therefore, the issue should have been
determined by the jury.[9]  Id. 

Although Dukes cites Torrington to support
their argument that Johnson/Ritchie assumed a duty by undertaking the
inspection of the Water Gardens, we determine that such reliance is
misplaced.  Whereas the court in Torrington
was able to specifically point to Torrington=s letter
to Bell Helicopter as an undertaking in which Torrington voluntarily broadened
its duty, Dukes has failed to demonstrate an affirmative act undertaken by
Johnson/Ritchie or Johantgen that broadened the scope of their duty.  Although Dukes argues that Johnson/Ritchie
and Johantgen=s inspection of the Water
Gardens was a voluntary undertaking, they have failed to explain how such
action is anything more than the architects=
complying with their existing contractual obligation. 








We have already determined that Johnson/Ritchie=s
contractual agreement with the City defined the scope of their duty and that
such a duty did not include a safety assessment.[10]  To hold that Johnson/Ritchie and Johantgen
voluntarily assumed a duty simply by performing an assessment of the Water
Gardens, an action that was in strict compliance with their contractual
obligation, does not comport with the general rule that an architect=s duty
depends on the particular agreement entered into with his employer.  See I.O.I. Sys., Inc., 615 S.W.2d at
790.  We will not disregard the plain
language of the contract that clearly defines the scope of the architects= duty
merely because Dukes argues that the voluntary undertaking doctrine
applies.  

Moreover, even if Dukes presented evidence that
Johnson/Ritchie and Johantgen undertook a duty, which Dukes has not, liability
still would not be imposed upon Johnson/Ritchie and Johantgen under the
voluntary undertaking theory because Dukes has failed to present a genuine
issue of material fact to show that the City relied on Johnson/Ritchie and
Johantgen=s 1999 assessment of the Water Gardens
or shown that their inspection increased the risk of harm.  See Entex, 94 S.W.3d at 10.








Dukes attempts to show that the City relied on
Johnson/Ritchie and Johantgen=s work
because both Johnson/Ritchie and Johantgen conceded that it was appropriate for
the City to rely on their work. 
Specifically, Dukes points to the following affidavit testimony to argue
that the City relied upon their professional expertise: 

Q: (By Mr. Ford) But all
I=m saying is the City has
the right to rely on [architects and contractors and engineers whom the City
has paid millions of dollars], true?

 

. . .
. 

 

A:
(By Mr. Ritchie) Well, yeah, but that=s our responsibility. 

 

. . .
. 

 

Q: (By Mr. Ford)
. . . [W]ould you agree that it would be appropriate
for . . . [the City] to rely upon Phillip Johnson, Alan Ritchie
Architects to perform that function of setting priorities?

 

. . .
.

 

A: (By Mr. Ritchie) Given
the criteria that you=ve stated, it would stand
to reason that, yes.

 








Although this evidence demonstrates that the City
was entitled to rely on Johnson/Ritchie and Johantgen=s
assessment, it is not evidence that the City actually relied on their
assessment.  In contrast, the summary
judgment evidence shows that the City never contacted Johnson/Ritchie or
Johantgen regarding any of the changes they suggested, nor did the City implement
any of the suggestions or modifications contained in the 1999 conditions
survey.  Even viewing this evidence in
the light most favorable to Dukes, it does not establish reliance, merely
because Dukes has shown that the City could have relied on the architect=s review
does not mean that they actually did rely on it.         Nor
has Dukes presented a genuine issue of material fact to show that
Johnson/Ritchie and Johantgen=s inspection
of the Water Gardens increased the risk of harm.  Dukes has not presented any evidence to show
that any risk of harm from the Water Gardens, and specifically the Active Water
Pool, was greater as a result of Johnson/Ritchie and Johantgen=s 1999
assessment than it had been before 
it.  See Entex, 94 S.W.3d
at 10 (holding that in determining whether there is an increased risk of harm,
we compare the risk of harm resulting from the negligence to that existing
before the undertaking).  Although
Johnson/Ritchie and Johantgen included their observation that algae or some
other organic growth was detected on the concrete surfaces in the conditions
survey, Dukes has not shown how the risk of harm was greater because of their
observation.  Nor has Dukes presented any
evidence to show that the risk of harm was greater after their review than it
was before the City contracted with them. 









Because
Dukes has failed to present competent, controverting evidence raising a genuine
issue of material fact that Johnson/Ritchie and Johantgen owed a duty to the
decedents, we determine that the voluntary undertaking rule is
inapplicable.  Therefore, whether
Johnson/Ritchie and Johantgen owed a duty is a question of law that was
properly determined by the trial court.  See 
Timberwalk Apartment Partners, 972 S.W.2d at 756. 

 

E.
Conclusion                      

Thus, based on the summary judgment evidence, we
determine that Dukes has failed to present a genuine issue of material fact
that Johnson/Ritchie or Johantgen owed or assumed any duty to the decedents.  See Centeq Realty, Inc., 899 S.W.2d at
197.  Thus, the summary judgment evidence
conclusively proves, as a matter of law, that Johnson/Ritchie and Johantgen=s work
on the Water Gardens restoration project gave rise to no legal duty.  Accordingly, we overrule Dukes=s issues
one through four and affirm the trial court=s
summary judgment as to Johnson/Ritchie and Johantgen. 

VII. Huitt/Keller 








In issues five through eight, Dukes argues that
the trial court erred by granting summary judgment to Huitt/Keller because the
evidence demonstrated that there were direct contradictions between testimony
of Emile Keller[11]
and City Supervisor, Richard Zavala; that Huitt/Keller owed duties of
care to the public; that Huitt/Keller failed to safeguard dangers; and where
Huitt/Keller had actual knowledge of the hazard at the Active Water Pool that
contributed to cause the deaths of the decedents. 

A.
Applicable Facts

On January 7, 1994, the City contracted with
Huitt/Keller to perform an architectural assessment of the Water Gardens.  The contract required Huitt/Keller to
provide an assessment of the Water Gardens and provide the City with a report
based on their findings.  The scope of
services included an assessment of the existing civil, structural, mechanical,
and electrical engineering services.[12]  As part of their contractual agreement,
Huitt/Keller was to submit both a 30% preliminary review as well as a final
report after all reviews of the Water Garden had been completed.[13]  The 30% review was submitted on March 7,
1994, and the final report was delivered on November 1, 1994. 








On April 26, 1995, the City again contracted with
Huitt/Keller to perform an assessment of the Water Gardens.  The scope of this assessment greatly differed
from the 1994 contract, in that under the terms of the 1995 contract,
Huitt/Keller was to focus solely on designs for the construction of ADA
improvements.  The 1995 contract
describing Huitt/Keller=s services stated that
Huitt/Keller was to

[p]erform architectural
and engineering design services for the construction of ADA improvements to the
Fort Worth Water Gardens, to include ramps, a viewing platform, safety curbs at
the Cascade Pool, and handrails for stairways leading to the Quiet Pool. 

 

The 1995 assessment did not involve a review of the Active Water
Pool.  On October 13, 1995, Huitt/Keller
delivered its report assessing necessary ADA improvements.         

On May 5, 2000, the City again contracted with
Huitt/Keller to participate in a workshop to review planning of future
development around the Water Gardens. 
The work Huitt/Keller provided in this instance was very limited in
scope and was only for the participation in a general study regarding future
development.  

B. Applicability of Professional Codes of Ethics in a Duty Analysis








Dukes argues that because Huitt/Keller had actual
knowledge of the hazard at the mouth of the Active Water Pool in 1994, and yet
failed to include such knowledge in their final report, they should be liable.[14]  Specifically, Dukes argues that such
liability may be imposed because professional codes of ethics require a
professional to report conditions which could endanger public safety and
health.   

As we have already determined, under Texas law,
there is no binding authority to support the Dukes=s
proposition that a court must take into consideration professional codes of
ethics when determining whether a duty is owed. 
See, e.g., Joe, 145 S.W.3d at 159 n.2 (stating that the Texas
Rules [of Professional Conduct] do not define standards of civil liability of
lawyers for professional conduct).  We
will not expand the legal exposure of design professionals beyond their
contractual undertaking, and therefore we determine that no liability may be
imposed upon Huitt/Keller merely because of their role as professional
architects. 

C. Premises Liability








Dukes next argues that Huitt/Keller owed a duty
under a premises liability analysis because they recognized the hazards
existing in the Water Gardens and that drowning was a foreseeable event.[15]  However, after reviewing the evidence in the
light most favorable to Dukes, we determine that Huitt/Keller cannot be held
liable under the general rule of premises liability because there is no dispute
that Huitt/Keller was neither the owner nor occupier in exclusive control of
the Water Gardens.  Because the
prerequisite to liability has not been met, Huitt/Keller cannot be held liable
for the decedents= deaths.  See Page, 701 S.W.2d at 835 (holding that
the prerequisite to liability is whether the party is a Apossessor@ or Aowner@ of the
premises, and if the party does not own, occupy, or otherwise control the
premises, they cannot be held liable for dangerous conditions on the
property).  

We next evaluate whether Dukes presented any
controverting evidence that Huitt/Keller owed a duty under either of the
recognized exceptions to the general rule of premises liability.  Under these exceptions, a party may be held
liable under a premises liability analysis only if the party has agreed to make
safe a known, dangerous condition on the premises and failed to do so, or the
party has created the dangerous condition.  See id.  








To determine whether the first exception applies,
we examine the summary judgment evidence to determine whether Huitt/Keller ever
expressly or implicitly agreed to make safe a known, dangerous condition.  See id. (evaluating whether the City
of Denton ever expressly or impliedly contracted to remedy any dangerous
condition on the property). 








Huitt/Keller=s first
contract with the City was executed on January 7, 1994.  This contract required them to provide an
architectural assessment of the Water Gardens and included the review of civil,
structural, mechanical, and electrical engineering services.[16]  Our review shows that the 1994 contract did
not include an express provision requiring Huitt/Keller to conduct a review of
safety issues; however, Dukes points to several extraneous documents that
allegedly indicate that a safety review was within the scope of Huitt/Keller=s
duties.  Dukes directs us to an April 11,
1995 document that recommends that the City execute a contract with
Huitt/Keller.  This document references
the City Council=s December 14, 1993 approval of
a professional services contract with Huitt/Keller requiring Huitt/Keller to
conduct an architectural assessment of the Water Gardens for Aplanning
of remedial projects in order to address safety, structural,
operational, and accessibility issues.@  [Emphasis added.] Dukes contends that this
document is evidence that Asafety
was to be a primary concern@ in
Huitt/Keller=s review of the Water Gardens. 

We determine that although this evidence
demonstrates that the City may have initially contemplated that Huitt/Keller
was expected to address safety issues in their assessment of the Water Gardens,
the actual contract between the City and Huitt/Keller imposed no responsibility
upon Huitt/Keller to address or remedy safety issues that they discovered in
the course of their assessment.[17]  Nor did Huitt/Keller=s 1995
and 2000 contractual agreements with the City demonstrate that Huitt/Keller
expressly agreed to make safe a known, dangerous condition.  Rather, the 1995 and 2000 contracts,
respectively, required Huitt/Keller only to determine necessary design services
for the construction of ADA improvements to the Cascade and Quiet Pools as well
as review planning of future developments around the Water Gardens.








A review of each of Huitt/Keller=s
contracts with the City demonstrate that Huitt/Keller never expressly or
impliedly agreed to make safe a known, dangerous condition.  Nor has Dukes presented any evidence showing
otherwise.  And as we have previously
stated, the scope of Huitt/Keller=s duty
is determined by their contracts with the City. 
See I.O.I. Sys., Inc., 615 S.W.2d at 790 (holding that an
architect=s or engineer=s duty depends
on the particular agreement entered into with his employer).  Furthermore, Dukes has failed to present any
evidence raising a genuine issue of material fact that Huitt/Keller created the
hazardous condition.  See Centeq
Realty, Inc., 899 S.W.2d at 197. 








Moreover, we are unpersuaded by Dukes=s
argument that liability should be imposed upon Huitt/Keller because they took Ahalf-steps
to address the potential hazard@ by
withdrawing their recommendation for safety barriers around the Active Water
Pool in reliance on discussions with the City after submitting the 30%
report.  Once again, Dukes attempts to
analogize this case to Crown Derrick Erectors, Inc., 117 S.W.3d at 526,
and once again, we determine that such reliance is misplaced.  Dukes has not presented any evidence that
Huitt/Keller ever agreed to correct any problems discovered in their work at
the Water Gardens.  Thus, Crown
Derrick=s analysis
is inapplicable because there is no evidence that Huitt/Keller was Aacting
to correct a danger it agreed to correct and that arose out of its own
work.@  See 117 S.W.3d at 526 (emphasis
added).  Therefore, no duty may be
imposed upon Huitt/Keller for withdrawing their recommendation for safety
barriers. 

After reviewing the record, and viewing the
evidence in a light most favorable to Dukes, we determine that Dukes has failed
to present controverting evidence that a duty was imposed upon Huitt/Keller
through premises liability.

D. Voluntary Undertaking 

Lastly, Dukes argues that Huitt/Keller can be
held liable for the decedents= deaths
because Huitt/Keller undertook inspection of the Water Gardens= entire
park pursuant to their 1994 agreement with the City. 

Once again, we determine that Dukes=s
attempt to impose a duty through the voluntary undertaking theory necessarily
fails.  Specifically, even if Dukes
presented evidence that Huitt/Keller undertook a duty, liability still would
not be imposed upon them because Dukes has failed to present a genuine issue of
material fact that the City relied on Huitt/Keller=s 1994
inspection of the Water Gardens or that their inspection of the Water Gardens
increased the risk of harm.  See
Entex, 94 S.W.3d at 10. 








Although Dukes asserts that liability may be
imposed because Huitt/Keller incorporated a recommendation for safety barriers
around the Active Water Pool in their preliminary report and suggested that the
City post signs or warnings around the Active Water Pool in their final report,
Dukes has not presented evidence that the City relied on these
recommendations.  Indeed, the summary
judgment evidence shows that the City chose not to implement any of
Huitt/Keller=s recommendations or any other
modification that Huitt/Keller suggested pursuant to their 1994 assessment of
the Water Gardens.  Specifically, the
summary judgment evidence shows that the City rejected these recommendations
because it felt that the Aliability potential [was] not
high,@ and
although the Active Water Pool was Apotentially
dangerous,@ Apeople
have not been falling in.@ 
Thus, the evidence is clear that the City did not rely on any alleged
undertaking that Huitt/Keller may have assumed. 









Furthermore, Huitt/Keller=s
inspection of the Water Gardens did not increase the risk of harm.  Dukes has failed to present evidence showing
that any risk of harm from the Water Gardens was greater as a result of
Huitt/Keller=s assessment than it had been
before the assessment.  See Entex, 94
S.W.3d at 10.  In contrast, the
uncontroverted evidence shows that at the time of Huitt/Keller=s 1994
assessment of the Water Gardens, the City knew of the danger that the Active
Water Pool posed.[18]  For example, the record shows that in 1994,
the City was aware of the dangers posed by the Active Water Pool but that it
reasoned that the Aliability potential [was] not
high.@  Moreover, the record also contains evidence that
as early as 1974, the City knew of the dangers posed by the Active Water
Pool.  Indeed, the City=s
attorney expressed his concern to the director of Parks and Recreation that
there were:

dangerous and hazardous
conditions existing in the nature of deep, exposed open pit areas with steep
embankments lubricated with flowing water into which children of all ages can
readily fall and slide.

 

The record also shows that a safety audit was conducted in 1974 that
alerted the City that Ashould someone fall into [the
Active Water Pool,] it would be practically impossible for them to get out
without adequate help.@ 
This evidence demonstrates that the risk of harm was equally as great
before Huitt/Keller conducted their assessment in 1994 as it was after their
assessment.  And Dukes has not presented
evidence showing otherwise.

Because there is no genuine issue of material
fact that the City relied on Huitt/Keller=s 1994
inspection of the Water Gardens or that such inspection increased the risk of
harm, we conclude that Dukes has failed to show that Huitt/Keller voluntarily
undertook a duty through their 1994 inspection of the Water Gardens. 








E. Conclusion 

Even viewed in a light most favorable to Dukes,
there is insufficient evidence to create a genuine issue of material fact that
Huitt/Keller owed or assumed any duty to the decedents.  Accordingly, we overrule Dukes=s issues
five through eight and affirm the trial court=s
summary judgment as to Huitt/Keller. 

VIII. Austin

 

In issues nine, ten, and eleven, Dukes asserts
that the trial court erred by granting summary judgment in favor of Austin
because the evidence demonstrates that there were safety hazards at the Active
Water Pool that were known to Austin=s
subcontractors, and yet no action was taken; where Austin owed duties to the
public; and where Austin=s failure to safeguard the
hazards at the Active Water Pool contributed to the cause of decedents= deaths.[19]


A.
Applicable Facts








In 2001 through 2002, Austin was under contract
with the City to act as the project manager for the Project.  Under the original contract, Austin was both
the construction manager and program manager, which meant that it had the Aexclusive
control of, and the exclusive right to control the details of the work
performed@ in conjunction with the
Project. 

After the City began renovating the Convention
Center, it became imperative for the City to also update the Water
Gardens.  Subsequently, the City and
Austin entered into two amendments to the original contract.  The second amendment provided that Austin
would contract with Johnson/Ritchie Afor the
preparation of a Master Plan for the incorporation of the Water Gardens into
the Project.@ 
However, none of Austin=s work
concerned the Active Water Pool. 

B. Analysis








Dukes argues that Austin was responsible for the negligence of the
architects and engineers whose work it supervised and coordinated because under
the original and amended contracts, Austin possessed the right to control the
work of individuals whom it coordinated.[20]  Thus, because Austin
retained control of their work, Dukes asserts that Austin was responsible for
the errors and omissions of its subcontractors.[21] 

We have closely reviewed the record in this case for evidence
supporting Dukes=s contention
that liability should be imposed upon Austin; however, we are unpersuaded by
Dukes=s
arguments.  Even if Austin=s contract
with the City imposed a duty upon it, Austin still could not be held liable for
the negligence of its subcontractors simply because Dukes failed to present
evidence demonstrating that these subcontractors owed a duty to decedents.  Phillips, 801 S.W.2d at 525.  By failing to establish the threshold issue
of duty, the issue of whether the subcontractors were negligent could not be
reached.  Id.  Therefore, any inquiry into whether Austin
may be held liable for its subcontractors is a nonissue.  Accordingly, we overrule Dukes=s issues
nine, ten, and eleven and affirm the trial court=s summary
judgment as to Austin. 

 

 

 

 

 

 

 

 

 








IX.
Conclusion

 

Because Dukes has failed to present
competent, controverting evidence raising a genuine issue of material fact that
Johnson/Ritchie, Johantgen, Huitt/Keller, or Austin owed a duty to the
decedents, we affirm the trial court=s summary judgment as to each of these parties.  See Centeq Realty, Inc., 899 S.W.2d at
197. 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON,
WALKER, and MCCOY, JJ.

DELIVERED: March 27, 2008

 

 











[1]It is undisputed that the
four individuals, whose deaths were the genesis of this case, were invitees. 





[2]We will collectively
refer to Appellees Philip Johnson/Alan Ritchie Architects, P.C., Philip
Johnson, Ritchie & Fiore Architects, P.C., Alan Ritchie, individually, and
David. G. Whitney, who is the executor of Philip Johnson=s estate as AJohnson/Ritchie@ for the sake of
clarity.  Similarly, although Peter
Johantgen and Peter Johantgen Consulting, Inc. are separate parties, we will
collectively refer to them as AJohantgen.@

We note that
Dukes refers to all of the aforementioned parties as the ANew York Architects@ in issues one through
four.  However, Peter Johantgen and Peter
Johantgen Consulting, Inc., together, are represented by different counsel than
the other parties in this section, and filed their own, distinct motions for
summary judgment.  For that reason, we
will not collectively refer to these parties as the ANew York Architects@; however, we will
evaluate Dukes=s assertions as to
Johnson/Ritchie and Johantgen at the same time. 






[3]Johantgen had previously
worked for Philip Johnson, Ritchie & Fiore Architects, P.C. from
1992-1997.  Mr. Fiore resigned in 1996,
and thereafter the firm changed its name to Philip Johnson/Alan Ritchie
Architects, P.C. (AJohnson/Richie@). 





[4]Although Dukes
specifically contends that a duty arose out of Johnson/Ritchie=s 1999 contract with the
City, throughout their brief Dukes also argues that the 1999 contract is only
one of two documents that defines the scope of the architects= services, the other
document being a 1997 letter from Richard Zavala, Director of the Parks and
Community Services Department, to John Robinson, Executive Director of the Amon
G. Carter Foundation.  The 1997 letter
included a summary of the meeting that took place between the department=s staff, Ritchie, and
Emile Keller, who is Vice-President of Appellee Huitt/Keller, where they discussed
possible design changes to the Water Gardens that would be effectuated if a
capital improvement was approved by voters the following year.  

In our review
of the scope of Johnson/Ritchie=s and Johantgen=s duties, we will not
examine the 1997 letter because it does not constitute a valid contract and,
therefore, does not define the scope of responsibility. See Hubbard v.
Shankle, 138 S.W.3d 474, 481 (Tex. App.CFort Worth 2004, pet. denied) (holding that to
constitute a valid contract, there must be an offer, acceptance, meeting of the
minds, each party=s consent to the terms,
execution, and delivery of the contract with the intent that it be mutual and
binding).  Indeed, Richard Zavala agreed
that the 1997 letter was not the contract with Johnson/Ritchie; instead, the
actual contract was negotiated and signed in the 1999 agreement.  Thus, in evaluating whether a contractual
duty existed, we look only to the April 22, 1999 agreement among the parties.





[5]It is undisputed that the
April 22, 1999 agreement constituted a valid contract between the City and
Johnson/Ritchie. 





[6]The 1997 letter
summarizing the meeting between Ritchie, Zavala, and others included the words Acomprehensive review.@  However, the 1999 contract contains no such
language.  Although Dukes attempts to
intermingle the language of the two documents to provide support for their
contention that the scope of Johnson/Ritchie=s review necessarily included a safety analysis,
we have already stated that we will only examine the 1999 contractual agreement
to determine the scope of Johnson/Ritchie=s responsibilities. 





[7]As pointed out by
Johantgen, foreseeability is part of causation, and his motion for summary
judgment was based on no duty, not a lack of causation. 





[8]Dukes asserts that
Johantgen observed a hazard in the form of Aalgae or growth or fungus or something like this@ on the stepping stones
around the Active Water Pool that created a slipping risk for falls into the
pool and that liability should be imposed because Athe architect=s report only made an
obscure reference to cleaning of organic deposits[] and [said] nothing about a
drowning hazard.@





[9]The court held that the
jury should have been instructed that Torrington was negligent only if (1)
Torrington undertook to perform services that it knew or should have known were
necessary for the plaintiffs= protection, (2) Torrington failed to exercise
reasonable care in performing those services, and either (3) the Navy relied
upon Torrington=s performance, or (4)
Torrington's performance increased the plaintiffs= risk of harm.  Id. at 838‑39. 





[10]Dukes contends that Afactual disputes
regarding the extent and scope of the undertaking by [Johnson/Ritchie and
Johantgen]. . . . at the Water Gardens should be submitted to a jury
for a factual finding.  The issue cannot
be decided as a matter of law.@  However,
Dukes fails to explain what the factual disputes are regarding the purported
undertaking that Johnson/Ritchie and Johantgen voluntarily assumed. 





[11]Emile Keller is the
Vice-President of Huitt-Zollars (collectively AHuitt/Keller@).





[12]Huitt/Keller was to Aconduct a detailed
investigation of the site, . . . 
document all problem areas@ that were Acontributing to multiple systems deterioration,@ and recommend solutions.






[13]The A30% Preliminary Review@ was given to the City
when Huitt/Keller  was one-third of the
way through the project.  According to
Keller=s deposition testimony,
the purpose of the review was A[t]o get feedback from the City on the direction
in which [Huitt/Keller] [was] going and [to] get comments from [the City].@





[14]Huitt/Keller=s 1994 final report
stated that A[the Active Water Pool]
is the most prominent, as well as the most hazardous. . . .A  Emile Keller acknowledged that the
unprotected edges at the stepping stones adjacent to the water falling into the
Active Water Pool were also potentially hazardous.





[15]Dukes does not specify
the hazard to which they are referring, but we presume that they are referring
to Athe hazard at the mouth
of the Active Water Pool.@





[16]Huitt/Keller=s responsibilities under
their 1994 contract were divided into three phases:  the preliminary assessment phase (A30% Preliminary Review@), in which Huitt/Keller
was required to Aidentify the primary
areas of concern@ and Atabulate all problem
areas@; the final assessment
phase, in which they were to Aidentify all problem areas contributing to
multiple systems deterioration@ and to Aresearch and develop solution options for each of
the problem types@; and, the assessment
report phase, in which Huitt/Keller was to develop a report addressing each of
the various problems and recommend solutions.





[17]The actual contract
between the City and Huitt/Keller was executed on January 7, 1994,
approximately three weeks after the City Council approved the professional
services contract. 





[18]Dukes acknowledges that
the Adangers of the Active
Water Pool existed at the time of both the 1994 assessment by [Huitt/Keller]
and [the] 1999 comprehensive review by [Johnson/Ritchie and Johantgen].@ 





[19]Again, Dukes does not
specify the hazard to which they are referring, but we presume that they are
referring to Athe hazard at the mouth
of the Active Water Pool.@





[20]Although Dukes raises
three issues on appeal as to Austin, the only argument that is analyzed and
supported by law is their contention that by retaining control over their
subcontractor=s work, Austin is
responsible for their negligence. 
Therefore, this is the argument that we now address. 





[21]ASubcontractors@ incorporates
Johnson/Ritchie as well as Johantgen who was retained by Johnson/Ritchie to act
as a consultant in their 1999 assessment of the Water Gardens.