**Opinion issued May 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00375-CV

————————————

**SYNERGY MEDSPA, LLC AND MICHAEL HOLLOWAY, Appellants**

**V.**

**2715 BISSONNET, LLC, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-13364**

---

## MEMORANDUM OPINION

This case involves a contract dispute stemming from a commercial lease between 2715 Bissonnet, LLC and Synergy MedSpa, LLC for space in Bissonnet's shopping center. Michael Holloway, who owns and operates Synergy, personally guaranteed Synergy's obligations under the lease. When Synergy terminated the

lease seven months after execution, Bissonnet sued Synergy and Holloway for breach of contract, claiming Synergy lacked the right to terminate the lease. Synergy counterclaimed for breach, seeking return of its deposit. Bissonnet successfully moved for summary judgment on its claim and on Synergy's counterclaim for breach of contract.

In three issues, Synergy and Holloway argue that the trial court erred in finding that Synergy breached the lease due to untimely termination and granting summary judgment on that basis because the evidence created numerous questions of material fact regarding the timeliness of Synergy's termination notice and there were also issues of material fact involving their affirmative defenses of impossibility and impracticability, all of which preclude summary judgment.

We affirm the trial court's judgment.

### Background

Appellee 2715 Bissonnet, LLC is a landlord for a shopping center at 2715 Bissonnet Street in the City of West University Place, Texas.[1] Appellant Synergy MedSpa, LLC is a medical spa in the Houston area.

On September 24, 2021 ( "Lease Execution Date"), Synergy entered into a lease agreement with Bissonnet ("Lease") for space in Bissonnet's shopping center, where Synergy intended to "build out and operate a medical spa under a 60-

---

[1]    West University Place is a municipality within the City of Houston.

month term."[2] Appellant Michael Holloway, who owned and operated Synergy, signed a Guaranty Agreement under which he (1) "absolutely and unconditionally" guaranteed to pay all amounts owed by Synergy and (2) agreed to indemnify and hold harmless Bissonnet from "all loss, damage, cost, and expense" to Bissonnet in the event Synergy defaulted on the Lease.

**The Lease**

Under the Lease, Synergy is obligated to pay the guaranteed minimum monthly rental and other stated charges for the lease term beginning on the "Commencement Date," defined as "that date that is one hundred fifty (150) days after the expiration of the Permit Period." The term "Permit Period" is defined as "One Hundred Twenty (120) days from the Lease Execution Date." According to Bissonnet, using the definitions in the Lease, the Commencement Date is calculated as follows:

| | |
|---|---|
| Lease Execution Date: | 9/24/2021 |
| Permit Period: | + 120 days |
| Expiration of Permit Period: | 1/22/2022 |
| Commencement Period: | + 150 days |
| Commencement Date: | 6/21/2022 |

During the Permit Period, Synergy was to obtain the required governmental or quasi-governmental permits needed for construction of its medical spa. The Lease gave Synergy the unilateral right to terminate the Lease if it was not

---

[2] The MedSpa Clinic was to specialize in weight loss treatments, hormone therapies, cosmetic procedures, and nutrition and fitness.

3

successful in obtaining the required permits before expiration of the Permit Period so long as Synergy provided Bissonnet written notice of termination on or before the expiration of the Permit Period. Specifically, the "Permit Contingency" clause provides that the

> *Tenant shall have a period of One Hundred Twenty (120) days from Lease Execution Date ("Permit Period") within which to obtain required approvals and permits ("Permits")* from the applicable governmental or quasi-governmental authorities having jurisdiction over the Premises to perform Tenant's construction at the Premises. *Tenant*, at its sole cost and expense, *shall prepare, process and submit all appropriate applications* and other documentation required by all applicable governmental bodies and agencies *to obtain the Permits within 60 days from Lease Execution. In such event the timelines shall be reasonably extended until such time that the normal functioning of the government or other agencies resume*. Tenant shall use reasonable diligence to obtain the Permits during the Permit Period and Landlord shall reasonably cooperate with Tenant in securing the Permits. *If Tenant is not successful in obtaining the Permits prior to the expiration of the Permit Period, then Tenant shall have the right to terminate this Lease by providing written notice of termination to Landlord on or before the expiration of the Permit Period*, in which event this Lease shall terminate without further obligation or liability by either party except for provisions which by their terms survive the termination hereof. *If Tenant does not terminate this Lease pursuant to the foregoing provision on or before the expiration of the Permit Period, Tenant shall be deemed to have elected to continue this Lease* and shall have no further right to terminate this Lease pursuant to this provision.

(Emphasis added.)

## Bissonnet's Lawsuit

Synergy did not submit its application to obtain the building permit for its medical spa "within 60 days from Lease Execution." Nor did it provide written

4

notice of termination to Bissonnet on or before expiration of the Permit Period—January 1, 2022. Instead, Synergy sent a termination notice to Bissonnet on April 7, 2022, stating it was terminating the lease because it had not been able to "obtain the necessary permits and approvals for the construction" of its medical spa despite its "diligent and good faith efforts." Two weeks later, on April 22, 2022, Synergy was advised that its "plans [were] approved and ready to issue for the contractor."

Bissonnet sent a demand letter to Synergy and Holloway, requesting payment of all amounts due under the Lease and the Guaranty Agreement. When the amounts remained unpaid, Bissonnet sued Synergy and Holloway for breach of contract seeking to recover the outstanding rent. Bissonnet alleged in its petition that, due to Synergy's "untimely termination of the lease," Bissonnet was forced to find a replacement tenant, who ultimately became obligated to begin paying rent to Bissonnet on May 29, 2023. Bissonnet alleged that under the Lease, Synergy was liable for the amounts due from the Commencement Date—June 21, 2022—until the replacement tenant began to pay rent on May 29, 2023.

In its amended original answer, Synergy argued it was not liable on the Lease because its performance "was made impracticable without [Synergy's] fault by the failure [of] the City of West University Place to issue the construction permit for the construction of the space to be used by [Synergy] under the lease contract." According to Synergy, as soon as the Lease was executed, Synergy

"promptly prepared and filed all documentation necessary to obtain the Permit for the construction." However, "the failure by the City of West University Place to issue the permit made the construction impossible," and "therefore prevented [Synergy] from being able to perform its obligations under the lease contract."

Synergy alleged that under the Lease, it had a unilateral right to terminate the Lease if it was "not successful in obtaining the Permits prior to the expiration of the Permit Period." Normally, Synergy alleged, that date would have been January 22, 2022, but here, the City of West University Place did not approve the permits at any time during the 120-day period following the Lease Execution Date despite "all the efforts Synergy made to obtain the Permit." Thus, relying on the Force Majeure provision of the Lease, Synergy argued that because the City had delayed in issuing the required permits and the delay was beyond the reasonable control of Synergy, the 120 days following the Lease Execution Date should have been excluded from the computation of the Permit Period. Synergy further argued that because the City's delay continued until at least April 7, 2022—when Synergy issued its written notice of termination to Bissonnet—its notice of termination was timely.

Synergy separately argued that its performance of the Lease was made impossible because the equipment it required to operate the medical spa was not available and the financing it had negotiated was cancelled due to Federal Deposit

Insurance Corporation regulations and the City's refusal to issue an occupancy permit until all necessary equipment was installed and approved.

Synergy asserted a counterclaim for breach of contract, arguing that because it had properly terminated the Lease, it was entitled to a return of its security deposit of $11,864.

In its first amended answer, Holloway argued that he was not liable to Bissonnet as a guarantor for the same reasons Synergy was not liable to Bissonnet as a lessee.

**Bissonnet's Motion for Summary Judgment**[3]

Bissonnet moved for traditional summary judgment on its breach of contract claim and Synergy's counterclaim.[4] Bissonnet argued that Synergy had not

---

[3] Bissonnet first moved for summary judgment on July 10, 2023. Following a hearing on the motion, the court deferred its ruling and ordered the parties to mediation, which was not successful. Synergy subsequently filed its counterclaim for breach of contract, after which Bissonnet noticed the deposition of Synergy's designer, Edward Dumont, who dealt with the City on the permitting issue. Synergy and Holloway also amended their answers and added affirmative defenses. Bissonnet subsequently amended its summary judgment motion, which is the motion the court granted and from which Appellants appeal. All references in our opinion to the "summary judgment" and "response" refer to Bissonnet's first amended motion for summary judgment and Synergy's and Holloway's response to the amended motion.

[4] In support of its amended motion, Bissonnet submitted the Lease and Guaranty Agreement, an affidavit from one its members and custodian of records, Synergy's termination letter, Bissonnet's demand letter, the replacement lease, a lease commission agreement, excerpts from the deposition of Edward Dumont— Synergy's designer, emails between Dumont and the City, Holloway, and Bissonnet, a photograph of Synergy's new medical spa location in Houston, and Synergy's website advertising its new location.

7

submitted the plans to the City on a timely basis as required by the Lease or exercised its termination option on or before expiration of the Permit Period. Bissonnet argued that Synergy had thus breached the Lease and defaulted on the amounts due. As to Holloway, Bissonnet argued that under the Guaranty Agreement, Holloway "absolutely and unconditionally guarantee[d] the full performance and observances of all the covenants, duties and obligation . . . therein provided to be performed and observed by [Synergy]" and made himself "fully liable" for such performance.

Bissonnet argued that Synergy and Holloway could not rely on any affirmative defenses because they had not served initial disclosures. *See* TEX. R. CIV. P. 194.2. And even if they could assert affirmative defenses, their defenses were not applicable. Bissonnet argued that an impracticability defense is very narrow and as applicable here, Synergy had to establish the "destruction or deterioration of a thing necessary for performance," and there was no allegation or evidence of any such destruction or deterioration. Bissonnet added that the mere fact a contract becomes "harder or more economical burdensome to perform" does not excuse performance under the frustration of purpose doctrine. And, in the context of governmental regulation, impracticability requires a showing that "the contractual obligations became illegal or impossible, not merely more difficult."

8

Bissonnet also argued that Synergy's defense that the City had made its performance impracticable by failing to issue the construction permit failed because the City advised Synergy that the "plans [were] approved and ready to issue for the contractor." Bissonnet also argued that the circumstances underlying Synergy's and Holloway's affirmative defense of impossibility—the alleged unavailability of equipment, cancellation of Synergy's financing, and the lack of an occupancy permit—were all "self-inflicted by [Synergy and Holloway's] own failure to timely move forward with submitting plans for permitting and progressing with the business as contemplated by the timeline specifically laid out in the lease." And it argued that Synergy's impossibility defense was "belied by the fact [that Synergy] ultimately open[ed] its spa at a different location."

Bissonnet rejected Synergy's contention that it had properly and timely terminated the Lease. Bissonnet pointed out that Synergy had "waited 116 days" after execution of the Lease "to submit building plans to the City," leaving only four days before expiration of the Permit Period. Bissonnet argued that Synergy's reliance on the Force Majeure provision lacked merit because the provision was inapplicable. Bissonnet argued that the "purpose of a force majeure clause, such as the one included in the Lease, is to excuse the lessee from non-performance of its lease obligations when non-performance is caused by circumstances beyond the reasonable control of the lessee." Bissonnet argued that "nothing prevented

Synergy from exercising its termination option" on or before the expiration of the Permit Period.

Bissonnet sought damages of $203,027.72, jointly and severally, from Synergy and Holloway, and attorneys' fees of $81,576.92.

In their summary judgment response, Synergy and Holloway argued that there were genuine issues of material fact over whether Synergy terminated the Lease within the permitted time limits. Synergy and Holloway acknowledged they submitted their permit application to the City 116 days after execution of the Lease. They argued, however, that the period after Synergy filed its permit application should have been excluded from the calculation of the Permit Period, and as a result, its termination of the Lease on April 7, 2022 was timely. Synergy and Holloway argued that after they applied for the permit, despite their best efforts, the City "never issued the Permit." They relied on the Force Majeure clause of the Lease, arguing that the City's delay in issuing the permit was "due to action taken by governmental authorities" beyond Synergy's "reasonable control" and thus the Permit Period was extended through April 7, 2022. This is the only argument Synergy and Holloway made in response to Bissonnet's motion for summary judgment. They did not address their affirmative defenses in their summary judgment response. And the only evidence submitted in response to Bissonnet's motion was the affidavit of Michael Holloway.

10

In its reply, Bissonnet argued that the Permit Contingency clause required the permit application to be submitted for approval within sixty days of the Lease Execution Date. Nonetheless, Synergy and Holloway had conceded that they had not submitted its permit application with the City until 116 days after execution of the Lease—leaving only four days before expiration of the deadline by when Synergy could unilaterally terminate the Lease. Bissonnet argued that the Force Majeure clause was inapplicable, but even if it were applicable, Synergy's argument ignored the Permit Contingency clause, which conditions any extension of the Permit Period on compliance with the sixty-day period to submit Synergy's permit application. Because Synergy had not submitted its application within the sixty-day period, "much less use[d] reasonable diligence in attempting to obtain the permits," Bissonnet argued that Synergy could not rely on the Force Majeure clause to extend its unilateral right of termination. Bissonnet emphasized that the expiration of the Permit Period was the "deadline by which [Synergy and Holloway] could unilaterally terminate the Lease without liability if a permit had not yet been obtained," but it was not the deadline by which the permit application had to be submitted.[5]

---

[5] Bissonnet also submitted an email from the City to Synergy's designer dated April 22, 2022, wherein the City states that the "plans [were] approved and ready to issue for the contractor" upon payment of the $1206.25 permit fee.

In their sur-reply, Synergy and Holloway rejected Bissonnet's interpretation of the Permit Contingency clause, arguing there is no provision that requires that Synergy's application for the permit be filed within sixty days of the Lease Execution Date to extend the right to terminate on or before the expiration of the Permit Period. They argued that the Force Majeure clause is applicable because it clearly excludes from the computation of time "any delays due to . . . action by governmental authorities." They argued that because the City did not give notice it was ready to issue the permit until April 22, 2022, any days prior to that date should be excluded from the computation of the Permit Period.

The trial court granted summary judgment in favor of Bissonnet on its breach of contract claim and on Synergy's counterclaim, awarding actual damages of $203,027.72, attorneys' fees of $81,576.92, prejudgment interest, costs of court, post-judgment interest, and contingent appellate attorneys' fees.[6] This appeal ensued.

## Standard of Review

We review a trial court's ruling on a motion for summary judgment de novo. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848

---

[6] Contrary to Synergy's and Holloway's statement in their brief, the hearing was not held on the amended summary judgment motion, which was filed after the hearing on Bissonnet's initial motion for summary judgment.

(Tex. 2009). In our review, "we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (citing *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). The party who moves for traditional summary judgment bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Mann*, 289 S.W.3d at 848 (citing TEX. R. CIV. P. 166a(c)). Once the movant establishes its right to summary judgment as a matter of law, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact precluding summary judgment. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995)); *Morgan v. City of Alvin*, 175 S.W.3d 408, 413 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Evidence raises a genuine issue of material fact if reasonable jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007); *Townsend v. Hindes*, 619 S.W.3d 763, 770 (Tex. App.—San Antonio 2020, no pet.).

We review questions of contract interpretation de novo. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). "In construing a

contract, we must look to the language of the parties' agreement" and "give effect to the parties' intentions as expressed in their agreement." *Id.*

## Interpretation of the Lease

In their first issue, Synergy and Holloway argue that the provision that governs the dispute is the Force Majeure provision in the Lease, which "exclude[s] from the computation of all timelines applicable to Synergy 'any delays due to . . . governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond [Synergy's] reasonable control.'"[7] The Force Majeure provision provides:

> ***Whenever a period of time is herein prescribed for action to be taken by Tenant*** or Landlord, the applicable party shall not be liable or responsible for, and ***there shall be excluded from the computation of any such period of time, any delays due to*** strikes, riots, acts of God, shortages of labor or materials, inclement weather, pandemic, epidemic, infectious disease, action by governmental authorities (including without limitation emergency declarations, quarantine orders, or stay at home orders), war, ***governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party***. . . .

(Emphasis added.)

Synergy and Holloway argue that their inability to obtain the permit for the medical spa during the Permit Period was beyond Synergy's reasonable control, triggering "additional and independent extension language in the contract." They

---

[7] The Lease identifies the paragraph as the "Force Majeure" clause. Synergy and Holloway refer to the paragraph as the "extension clause." For the sake of consistency, we refer to the provision as the Force Majeure clause.

14

argue that pursuant to the Force Majeure clause, "for any time period in which Synergy was obligated to act, the clock would stop counting any time one of the listed causes [in the force majeure clause] delayed Synergy's ability to satisfy those obligations." Thus, they argue, the Force Majeure clause effectively extended (1) the 120-day deadline to terminate the Lease, and (2) the sixty-day deadline to submit permit applications to the City. With respect to the former, they argue that "a termination for lack of permits was timely, so long as there was delay outside of Synergy's control that extended the time period for the Permit Period until April 7, 2022," when Synergy submitted its termination notice to Bissonnet. With respect to the latter, they argue that given the "many delays outside of Synergy's control during that initial 60-day period following the Lease execution," the Force Majeure clause extended that timeline as well.

Bissonnet argues that the permitting process does not, in these circumstances, qualify as a "government law, regulation, or restriction." It argues that because permitting is specifically addressed elsewhere in the Lease, the general language in the Force Majeure clause concerning "governmental laws, regulations, or restrictions" cannot be interpreted to include permits. Indeed, it is well-settled that "a specific contract provision controls over a general one." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (citing *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019).

15

In addition, according to Bissonnet, the interpretation urged by Synergy and Holloway "would impermissibly render the [P]ermit [C]ontingency clause meaningless." Bissonnet argues that the Permit Contingency clause clearly states that permit applications and any required documentation shall be submitted within sixty days from the Lease Execution date, and only "*in such event*" will the timelines "be reasonably extended until some time that the normal functioning of the government or other agencies resume." (Emphasis added.) Synergy did not submit the permit application during the sixty-day window. And the Force Majeure clause cannot be interpreted in such a way as to obviate the Permit Contingency clause. In other words, according to Bissonnet, pursuant to the Permit Contingency clause, for any timeline to be extended or tolled, the permit application must be submitted within sixty days of the Lease Execution Date. Because the permit application was not submitted within sixty days, the Permit Period was not extended.

We agree with Bissonnet that the Force Majeure provision did not extend the Permit Period and thus Synergy's termination notice was not timely. Courts are to "avoid construing contracts in a way that renders contract language meaningless." *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (citing *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 747 (Tex. 2020)). "We construe contracts as a whole in an effort to harmonize and give effect to all the

16

provisions of the contract so that none will be rendered meaningless." *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004).

The Permit Contingency Clause, which is set forth in the Lease addendum, provides that the

> ***Tenant shall have a period of One Hundred Twenty (120) days from Lease Execution Date ("Permit Period") within which to obtain required approvals and permits ("Permits")*** from the applicable governmental or quasi-governmental authorities having jurisdiction over the Premises to perform Tenant's construction at the Premises.

(Emphasis added.) Relevant here, the clause provides that Synergy "shall" submit its permit application within sixty days from execution of the Lease:

> Tenant, at its sole cost and expense, shall prepare, process and submit all appropriate applications and other documentation required by all applicable governmental bodies and agencies to obtain the Permits ***within 60 days from Lease Execution***.

(Emphasis added.) The sixty-day time period is significant because as the clause provides, if Synergy submits its application "within 60 days from Lease Execution," then "in such event" the timeliness "shall be reasonably extended":

> ***In such event the timelines shall be reasonably extended until such time that the normal functioning of the government or other agencies resume***. Tenant shall use reasonable diligence to obtain the Permits during the Permit Period and Landlord shall reasonably cooperate with Tenant in securing the Permits.

(Emphasis added.) In other words, the extension of any "timelines" in the Contingency Clause is conditioned on the submission of the permits within sixty days of the Lease Execution.

17

It is undisputed that Synergy's permit application was not submitted during the sixty-day window provided for in the Permit Contingency clause.[8, 9] While the Force Majeure provision states that "any delays due to . . . action by governmental authorities . . . laws, regulations or restrictions or any other cause of any kind whatsoever which are beyond the reasonable control" of Synergy "shall be excluded from the computation" of "a period of time []herein prescribed for action to be taken" by Synergy, the Permit Contingency clause expressly provides that "the timelines shall be reasonably extended until such time that the normal functioning of the government or other agencies resume" when the permits application is submitted within sixty days of the Lease Execution Date. Thus, the

---

[8]      Synergy and Holloway do not explain why they missed the sixty-day deadline. They merely state in their appellate brief:

> [B]efore the Lease was even executed, Synergy hired the engineer (Dumont), who had designed the building, to prepare the designs and permit documents and to work directly with the City[.] That expert was the only one with contact with the City . . . and Dumont submitted the permit directly to the City[.] The engineering work by that expert lasted several months following the Lease execution to prepare the designs and plans and the permit application. The City also hired a new building official during this time period, which caused further delay[.]

(Internal record citations omitted.) Synergy and Holloway did not make this argument in response to Bissonnet's summary judgment motion nor did they submit any evidence on this point.

[9]      Synergy and Holloway argue that the failure to submit a permit application within the sixty-day timeline "would not breach the contract or support Bissonnet's summary judgment." But Bissonnet did not argue that the failure to submit the permit application within sixty days was a breach. Rather, it argued that the Permit Contingency clause provided for the extension of timelines if the application was submitted within sixty days.

extension of the "timelines" in the Permit Contingency clause, which includes the 120-day Permit Period, is contingent on the timely submission of the permit application. To construe the contract otherwise would render the "in any such event" language in the Permit Contingency clause superfluous.

To the extent there is any conflict in the language of the two provisions, the Permit Contingency clause controls. The Force Majeure provision is set forth in the Lease, while the Permit Contingency Clause is set for the in the Lease Addendum. As Bissonnet correctly notes, the Lease Addendum provides that "[if] any provisions in this Addendum are inconsistent with the provisions contained in the main body or any other Exhibits of the Lease Agreement, then the provisions of this Addendum govern and control." Given that the Addendum's Permit Contingency clause controls over any inconsistent language elsewhere in the Lease, we hold that the Force Majeure clause does not control or otherwise work to extend the Permit Period of the Lease under the circumstances here.

We overrule Synergy's and Holloway's first issue.

## Questions of Material Fact

In their second issue, Synergy and Holloway argue that a fact dispute remains as to whether "delay outside of Synergy's *reasonable* control occurred that extended the Permit Period timeline to terminate." (Emphasis in original.) Synergy and Holloway argue on appeal that their summary judgment evidence indicates that

19

their inability to obtain permits during the Permit Period resulted from delays over which they had no control. They argue that:

- Before the Lease was executed, Synergy hired the building engineer who helped design the shopping center to obtain permits;

- The engineer's work took several months until the permit application was submitted;

- The engineer dealt directly with the City;

- During the application process, the City hired a new building official whom the engineer had not worked with previously;[10]

- The engineer prepared and submitted the permit application within 120 days of the Lease's execution;

- After 120 days, but while the permit application was still pending, Synergy and Holloway sent a notice of termination; and

- Synergy and Holloway did not have any control over accelerating the process.

Synergy and Holloway rely on Holloway's affidavit attached to Synergy's First Amended Original Answer in explaining that "Synergy hired Dumont for the project because he was the engineer that had worked to design the shopping center itself" and that he "believed that using Dumont would help facilitate gaining permit approval for the Synergy project." That affidavit, however, was not attached to their summary judgment response or sur-response. And Holloway's amended

---

[10]    In its summary judgment reply, Bissonnet cited testimony from Dumont that there were no changes in the City's regulations, restrictions, or building code that made the issuance of the permit impossible.

20

affidavit, which was the only affidavit submitted in support of Synergy's summary judgment response, did not address these issues. That affidavit merely states that

> After the execution of the Lease, Synergy's engineer, Mr. Ed Dumont, finalized the plans and drawings for the buildout, prepared the application for the permit (the "Application"), and filed the Application with the City. The Application was filed several days before the end of the Permit Period.
>
> The City delayed the approval of the plans and drawings filed with the Application until April 22, 2022. On that date, rather than issuing the Permit, the City sent Mr. Dumont an email stating that the City "was ready to approve the plans and drawings."
>
> The City never issued the Permit for which the Application was made.

Synergy and Holloway did not explain in this affidavit or in their summary judgment response or sur-response how delays in obtaining the permit were beyond their "reasonable control," nor did they submit evidence on these points creating a genuine issue of material fact. The details provided in Synergy and Holloway's appellate brief regarding Dumont's efforts to secure the permits is not even hinted at in the summary judgment response or sur-response. Indeed, there is no specific citation to Dumont's deposition testimony or to any summary judgment evidence other than Holloway's amended affidavit and the Lease in the response and the sur-response. The only mention of Dumont in the summary judgment response is in two brief paragraphs that quote *verbatim* from Holloway's amended affidavit:

9. After the execution of the Lease, Synergy's engineer, Mr. Ed Dumont, finalized the plans and drawings for the buildout, prepared the application for the permit (the "Application"), and filed the Application with the City. The Application was filed several days before the end of the Permit Period.

10. The City delayed the approval of the plans and drawings filed with the Application until April 22, 2022. On that date, rather than issuing the Permit, the City sent Mr. Dumont an email stating the City "was ready to approve the plans and drawings.

And in their sur-response, Appellants only state—without citation to any specific deposition excerpts—that Dumont testified "he was hired in August of 2021 to do the engineering and design work. He also testified that the engineering work was ongoing during the months after the execution of the Lease, leading up to the time when the application was filed."

Even if Synergy and Holloway's references to uncited excerpts of Dumont's deposition were sufficiently specific to be relied upon by the trial court, they do not create a genuine issue of material fact with respect to Synergy's purported lack of reasonable control over the permitting process and the ensuing termination process. While there is testimony that the engineering work was ongoing up to the time the permit application was filed, there is no testimony that the failure to submit the permit application within sixty days of the Lease Execution Date was beyond Dumont's reasonable control—or that of Synergy or Holloway. Nor does the fact that Dumont was hired in August 2021—the month before the Lease was

22

executed—establish that the failure to timely obtain the permits was beyond Synergy's control.

We overrule Synergy's and Holloway's second issue.

**Affirmative Defenses**

In their third issue, Synergy and Holloway argue that material fact issues exist regarding Synergy's affirmative defenses of impracticability and impossibility. They argue that compliance with the Lease was rendered impracticable because the City did not issue the permit prior to termination, and compliance was impossible because Synergy could not build on the premises, open its business, or obtain the necessary equipment without a permit, the financing fell through because of the permitting delays that were not its fault, and the City would not issue an occupancy permit before all equipment was installed and improved.

"To properly preserve an affirmative defense for purposes of appeal of a summary judgment, a defendant must expressly present that affirmative defense to the trial court in the summary judgment proceeding, whether it be through [its] own motion for summary judgment and/or in a response to the plaintiff's motion for summary judgment, and adduce proof supporting that defense." *Jourdan v. Jacobs*, No. 04-17-00487-CV, 2018 WL 3634990, at *4 (Tex. App.—San Antonio Aug. 1, 2018, no pet.) (mem. op.) (citing *TPS Freight Distribs., Inc. v. Tex. Com. Bank-Dallas*, 788 S.W.2d 456, 459 (Tex. App.—Fort Worth 1990, writ denied)).

23

Synergy and Holloway did not make these arguments in their summary judgment response or sur-response. Indeed, they did not address their affirmative responses at all in response to Bissonnet's motion for summary judgment. We thus do not consider their affirmative defenses as grounds for reversal. *Id.*; *Escondido Res. II, LLC v. Justapor Ranch Co., L.C.*, No. 04-14-00905-CV, 2016 WL 2936411, at *2 (Tex. App.—San Antonio May 18, 2016, no pet.) (mem. op.) (declining to consider affirmative defenses as grounds for reversal when affirmative defenses were not mentioned in appellant's written response to appellee's summary judgment motion) (citing *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("[I]ssues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence."); *Lively v. Carpet Servs., Inc.*, 904 S.W.2d 868, 875–76 (Tex. App.—Houston [1st Dist.] 1995, writ denied) ("To preserve an affirmative defense, the non-movant not only must raise the defense in its response, it must also provide enough summary judgment evidence to create a fact issue on each element.") (citation omitted).[11]

---

[11] "[M]erely raising [] an affirmative defense in an answer to a petition does not preserve that defense on appeal from a summary judgment in favor of the plaintiff." *Jourdan v. Jacobs*, No. 04-17-00487-CV, 2018 WL 3634990, at *4 (Tex. App.—San Antonio Aug. 1, 2018, no pet.) (quoting *TPS Freight Distribs.,*

We overrule Synergy and Holloway's third issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Morgan.

---

*Inc. v. Tex. Commerce Bank-Dallas*, 788 S.W.2d 456, 459 (Tex. App.—Fort Worth 1990, writ denied)).